**Richard Earl LEWIS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–00–306–CR.**

Court of Appeals of Texas, Fort Worth.

Feb. 14, 2002.

---

David A. Pearson, IV, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Assistant Criminal District Attorney and Chief of the Appellate Section, Sharon A. Johnson, John W. Carlough, Assistant Criminal District Attorneys, Fort Worth, for Appellee.

Panel F: CAYCE, C.J.; DAY and DAUPHINOT, JJ.

## OPINION

DAUPHINOT, Justice.

Richard Earl Lewis appeals his conviction by a jury for driving while intoxicated (DWI) enhanced by a prior felony conviction. The jury assessed punishment at eighteen years' confinement. In a single point, Appellant contends that the trial court reversibly erred by admitting into evidence his statement to a police officer that he had consumed alcohol. We affirm.

### Factual Background

The evidence at trial showed that at about 2:30 p.m. on August 22, 1999, Appellant drove his red Ford Probe from the westbound to the eastbound lane of Vernon Castle, a residential street in Benbrook, Texas, and collided with an oncoming vehicle occupied by the driver Lou Lilly and her daughter Donna Barnes. When Appellant veered into her path, Lilly honked her horn, but she was unable to avoid the head-on collision. As Lilly and Barnes got out of their vehicle, Appellant ran up and repeatedly said "I'm sorry, I'm sorry, please forgive me." Because Appellant had slurred speech, was not walking too straight, and was wet from his waist down to his knees, it was Lilly's opinion that he was very drunk. Appellant stumbled and sat down on the curb next to Barnes, whose leg had been injured. Slur-

ring his words, he begged her to forgive him.

R.H. Bull, an off-duty Benbrook police officer, heard the crash from his nearby residence and jogged to the scene of the collision. Bull approached Appellant to see if he was injured and asked him whether the vehicle was his and whether he was okay. Appellant responded in the affirmative. Bull noticed that Appellant's pants were wet, his eyes were bloodshot and watery, and there was an odor of an alcoholic beverage. On cross-examination, Bull testified that he would not have let Appellant leave but added "[h]e hadn't attempted, so I didn't have to exert any authority." Bull further testified that in his conversation with Appellant, he was wearing civilian clothes and did not think that he identified himself as a police officer.

Benbrook police officer Richard Cooper testified that he responded to a dispatch and arrived at the scene at 2:38 p.m. Cooper observed the red Probe facing westbound in the eastbound lane of Vernon Castle and a blue Buick facing eastbound. After Bull pointed out Appellant as the driver of the red vehicle, he testified that he told Cooper he believed Appellant was intoxicated. Cooper testified, however, outside the presence of the jury, that he did not recall Bull saying anything about alcohol being involved. Cooper went over to Appellant to find out what had occurred at the accident and asked for his driver's license and insurance information. Cooper noticed that Appellant stumbled as he stood up and had the smell of an alcoholic beverage and bloodshot and glassy eyes.

In a hearing outside the jury's presence, Cooper testified that after he asked for Appellant's driver's license and insurance information, Appellant acknowledged the red car was his. Cooper testified that after he noticed the odor of an alcoholic beverage and saw Appellant stumble, he asked Appellant if he had had anything to drink, and Appellant responded that he had had approximately five beers. Cooper testified that he had not read Appellant his Miranda[1] rights at that time. Cooper next asked Appellant to perform some sobriety tests there at the roadside, but Appellant refused. Cooper then decided to arrest Appellant for DWI, and he did so. Officer Cooper testified before the jury that before he arrested Appellant, Appellant told him that he had had about five beers, but later at the police station Appellant stated in the videotaped questioning that he had not had any.

## Discussion

The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.[2] Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[3] Where, as in this case, the facts are undisputed and there are no questions of credibility or demeanor, we review de novo the question of whether a statement was the product of custodial interrogation.[4]

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

2. *Id.* at 444, 86 S.Ct. at 1612.

3. *Id.*

4. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim.App.1997).

In determining whether an individual was in custody, the ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.[5] The determination depends on the objective circumstances, not on the subjective views of either the interrogating officers or the person being questioned.[6] Moreover, the determination is made on an ad hoc basis.[7] Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest.[8]

In *Berkemer v. McCarty*, the U.S. Supreme Court held that in light of the atmosphere surrounding questioning at an ordinary traffic stop, which is exposed to public view and is unlike the frequently prolonged interrogation at the station house, persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.[9] Moreover, *Berkemer* reached this conclusion despite recognizing laws making it a crime either to ignore a policeman's signal to stop one's car or to drive away without permission and the fact that few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so.[10]

In *Berkemer,* a motorist convicted of operating a motor vehicle under the influence of alcohol and/or drugs appealed the denial of his motion to exclude statements he made without being apprised of his *Miranda* rights. The facts occurring before formal arrest were as follows:

On the evening of March 31, 1980, Trooper Williams of the Ohio State Highway Patrol observed respondent's car weaving in and out of a lane on Interstate Highway 270. After following the car for two miles, Williams forced respondent to stop and asked him to get out of the vehicle. When respondent complied, Williams noticed that he was having difficulty standing. At that point, "Williams concluded that [respondent] would be charged with a traffic offense and, therefore, his freedom to leave the scene was terminated." . . . However, respondent was not told that he would be taken into custody. Williams then asked respondent to perform a field sobriety test, commonly known as a "balancing test." Respondent could not do so without falling.

While still at the scene of the traffic stop, Williams asked respondent whether he had been using intoxicants. Respondent replied that "he had consumed two beers and had smoked several joints of marijuana a short time before." . . . Respondent's speech was slurred, and Williams had difficulty understanding him. Williams thereupon formally placed respondent under arrest and transported him in the patrol car to the Franklin County Jail.[11]

In addition to holding that the initial traffic stop did not, by itself, render the respondent "in custody," *Berkemer* held that at no time between the stop and ar-

---

**5.** *Stansbury v. California,* 511 U.S. 318, 322, 114 S.Ct. 1526, 1528–29, 128 L.Ed.2d 293 (1994) (per curiam).

**6.** *Id.* at 323, 114 S.Ct. at 1529.

**7.** *Dowthitt v. State,* 931 S.W.2d 244, 255 (Tex. Crim.App.1996).

**8.** *Id.*

**9.** 468 U.S. 420, 438–39, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984).

**10.** *Id.* at 436, 104 S.Ct. at 3148.

**11.** *Id.* at 423, 104 S.Ct. at 3141–42.

rest was the respondent subjected to restraints comparable to those associated with a formal arrest. Justice Marshall's opinion reasoned as follows:

> Only a short period of time elapsed between the stop and the arrest. At no point during that interval was respondent informed that his detention would not be temporary. Although Trooper Williams apparently decided as soon as respondent stepped out of his car that respondent would be taken into custody and charged with a traffic offense, Williams never communicated his intention to respondent. A policeman's unarticulated plan has no bearing on the question whether a suspect was "in custody" at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation. Nor do other aspects of the interaction of Williams and respondent support the contention that respondent was exposed to "custodial interrogation" at the scene of the stop. From aught that appears in the stipulation of facts, *a single police officer asked respondent a modest number of questions and requested him to perform a simple balancing test at a location visible to passing motorists. Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest.*
>
> We conclude, in short, that respondent was not taken into custody for the purposes of Miranda until Williams arrested him. Consequently, the statements respondent made prior to that point were admissible against him.[12]

A number of Texas decisions have followed *Berkemer* and held that an officer's roadside questioning of a motorist did not constitute "custodial interrogation" so as to require the *Miranda* warning. In *State v. Stevenson*, the investigator of a one-car accident asked who was driving, and both Stevenson and his wife answered that she was.[13] When the officer noticed the wife's injury indicated she was the passenger, the officer asked Stevenson again who was driving, and he admitted that he had been driving. The officer also noticed that Stevenson smelled of alcohol. After failing field sobriety tests, Stevenson was arrested. At no time before the arrest was he given *Miranda* warnings.[14]

In holding Stevenson's statements admissible, the Texas Court of Criminal Appeals held that the investigation was no more intrusive than in *Berkemer*, and even if Stevenson had become the focus of a DWI investigation, that fact alone would not give rise to custody.[15] *Stevenson* further noted that the existence of probable cause to arrest did not distinguish the case from *Berkemer* where the officer possessed probable cause to arrest after the suspect failed the sobriety test.[16] Additionally, the *Stevenson* court held that the penal statute requiring a driver in an automobile collision to stop and render aid does not really require that the driver either stop or remain at the scene. The court explained that the sole purpose of the statute is to require the driver to provide insurance information. If this purpose has been accomplished or can be accomplished in another manner, the driver is free to leave. *Stevenson* concluded: "The officer merely asked questions dur-

---

12. *Id.* at 441–42, 104 S.Ct. at 3151–52 (emphasis added) (footnotes omitted).

13. 958 S.W.2d 824, 825 (Tex.Crim.App.1997).

14. *Id.* at 825–26.

15. *Id.* at 829.

16. *Id.* at 829 n. 7.

ing a continuing investigation and administered sobriety tests. These acts are not sufficient to establish custody under *Miranda*." [17]

In *Abernathy v. State*, the San Antonio Court of Appeals held that a motorist was not in custody so as to warrant a *Miranda* warning prior to responding to the officer's questions concerning his consumption of alcohol.[18] The facts in *Abernathy* were as follows:

> Appellant was stopped by San Antonio Officer Charles Marcus for speeding. After getting Appellant stopped, Marcus approached the vehicle and, upon Appellant opening his window, smelled a moderate odor of intoxicants. Marcus noticed that Appellant's eyes were glassy. He asked appellant to get out of the vehicle, and asked him if he had had anything to drink. Appellant responded that he had had a few drinks. Marcus then asked Appellant to perform a series of three field sobriety tests. After Appellant performed the field sobriety tests, Marcus asked him how much he had had to drink. Appellant responded that he had consumed four drinks. Thereafter, Marcus placed Appellant under arrest for driving while intoxicated.[19]

Noting the similarity of the facts with those in *Berkemer*, the opinion in *Abernathy* held that the officer's questioning and administering of the field sobriety test were in pursuance of a temporary investigation to determine whether or not the Appellant was driving while intoxicated and that there was no coercive atmosphere of custodial interrogation as contemplated by *Miranda* or its progeny.[20]

In *Hutto v. State*, a motorist involved in a one-vehicle accident was convicted of DWI and contended on appeal that the trial court erred in admitting evidence of his statements to Officer Miner, the first investigating officer to arrive at the scene of the accident, that he had been driving the truck and had consumed four beers.[21] The facts were as follows:

> Appellant was standing behind the truck, and Miner asked him if anybody had been hurt. Appellant responded by stating, "I missed my turn." ... Miner asked appellant for his driver's license, and appellant pulled his wallet out, spilling papers and credit cards on the ground. Appellant then bent over to pick up his papers, and stumbled twice in the process. Miner noted that appellant's speech was slurred, and that he smelled strongly of alcohol. Suspecting that appellant may be intoxicated, Miner asked appellant to perform field sobriety tests. Officer Beason arrived at the scene, and proceeded to videotape appellant doing field sobriety tests and talking to the officers.... The record taken by the court reporter indicates appellant performed several field sobriety tests, and told the officers he had "four beers." Officer Miner told appellant he failed all his tests, and placed appellant under arrest for DWI at that point....
>
> After he arrested appellant, Miner took him to the patrol car, and then read appellant his *Miranda* warnings. Thereafter, appellant was taken to the police station and given a breath test which provided readings of .184 and

---

17. *Id.*

18. 963 S.W.2d 822, 824 (Tex.App.—San Antonio 1998, pet. ref'd).

19. *Id.* at 823.

20. *Id.* at 825.

21. 977 S.W.2d 855, 856 (Tex.App.—Houston [14th Dist.] 1998, no pet.).

.189.[22]

Applying the principles recognized in *Berkemer* and *Stevenson*, it was held in *Hutto* that the Appellant's roadside statements were admissible:

> There is no evidence in this record that Miner manifested to appellant any intent to arrest until after the field sobriety testing was complete, and Miner informed appellant he was under arrest for DWI. We find that appellant's investigation for field sobriety testing and questioning did not convert the roadside stop into an arrest. These acts are not sufficient to establish custody under *Miranda*. *Stevenson*, 958 S.W.2d at 829.[23]

Similarly, in *State v. Waldrop*, the Austin Court of Appeals followed *Berkemer* and *Stevenson* and held that the roadside statements of a motorist later charged with DWI were admissible and not the product of custodial interrogation by the officer despite lack of a *Miranda* warning.[24] The facts were as follows:

> On August 8, 1998, Austin Police Department Detective Paul Johnson stopped Waldrop sometime after midnight for driving the wrong way down a one-way street. Detective Johnson asked Waldrop to walk to the back of his truck. The detective testified that Waldrop swayed slightly while standing behind his truck and that he asked Waldrop whether he had been drinking. Waldrop responded that he had consumed a couple beers. Detective Johnson testified that Waldrop told him he had been at Antone's, a local blues club. Waldrop implored, "Just let me get a ride home, I'll quit driving." Waldrop then volunteered that he knew he was drunk. On cross-examination, Detective Johnson was unable to remember the exact questions he asked Waldrop. He also was unable to recall which one of Waldrop's statements came first and whether Waldrop's admission that he was drunk was in response to a question.[25]

Other cases have held roadside statements to be inadmissible, however, because they were the product of custodial interrogation and were made without having been given the *Miranda* warning. In *Jordy v. State*, this court considered the following facts arising from a traffic accident:

> Near the scene of the accident, [Officer] Lynn saw Appellant, who matched the police dispatcher's description of the suspect, walking on foot. Lynn immediately saw that Appellant was unsteady on his feet, swaying from side to side when he walked. Upon approaching Appellant, Lynn noticed that he had a strong odor of alcohol on his breath and his eyes were red and glassy.

> Appellant did not have a driver's license with him, but verbally provided Lynn his name and date of birth. Lynn asked Appellant how much he had been drinking. Instead of answering the question, Appellant lay down on the ground and said he needed medical attention.

> Lynn inquired about Appellant's injuries and then called for an ambulance because he was concerned that Appellant may have been suffering from a closed-head injury, and Lynn did not want Appellant to leave the scene if he did have such a serious injury. Lynn again asked how much Appellant had

---

**22.** *Id.*

**23.** *Id.* at 858.

**24.** 7 S.W.3d 836, 839–40 (Tex.App.—Austin 1999, no pet.).

**25.** *Id.* at 837.

been drinking, and Appellant answered, "A lot." When the ambulance arrived, Appellant refused to go to the hospital.

He told one of the responding paramedics that he had drunk twelve beers. Lynn had not placed Appellant under arrest at this time. Appellant himself testified at trial that he had drunk a six-pack of beer that evening and that he had a half empty whiskey bottle and some empty beer cans in the car.

After Appellant refused transport to the hospital, Lynn tried to administer some field sobriety tests, but Appellant refused to perform them. Lynn formally arrested Appellant for public intoxication, believing his intoxication made him a danger to himself or to others.[26]

*Jordy* held that the trial court erred in admitting the Appellant's statement, "A lot," under the test provided in *Dowthitt* that custody is established when: (1) an officer has probable cause to arrest a suspect and does not tell him that he is free to leave; (2) the officer manifests this knowledge to the suspect; and (3) a reasonable person in the suspect's position would believe he is under restraint to the degree associated with an arrest.[27] The opinion reasoned:

> A police officer witnessing someone committing a criminal offense has probable cause to arrest. Having personally observed Appellant commit the offense of public intoxication, Lynn had probable cause to arrest him. Specifically, Lynn observed that Appellant was unsteady on his feet, had a strong odor of alcohol on his breath, and his eyes were red and glassy.

Moreover, Lynn believed that Appellant's intoxication made him a danger to himself or others. Lynn did not tell Appellant he was free to leave. Lynn manifested to Appellant knowledge of probable cause to arrest him by asking how much he had drunk and attempting to administer field sobriety tests.

> A reasonable person in this position would most certainly believe he is under restraint to the degree associated with an arrest. Consequently, we find that Appellant was in custody at the time he responded to Lynn's question. It was, therefore, error for the trial court to have admitted Appellant's statement, "A lot."[28]

The error in *Jordy* was held to have been harmless, however, in light of other evidence of the Appellant's intoxication admitted without objection.[29]

Finally, in *Alford v. State*, this court reversed a DWI conviction because of the admission of the Appellant's statement that he had six beers that was made in the absence of the warning required by *Miranda* and after having been handcuffed and placed on the ground.[30] The facts were as follows:

> Officer Paul Warren of the Lewisville Police Department saw Appellant's truck on the interstate. He pulled behind Appellant. According to Warren, Appellant's truck was passing cars and weaving in and out of lanes. Warren activated his emergency lights. Appellant slowed down, but did not stop. After following the truck for a while, Warren turned on his siren. He followed the truck into the Hickory Creek–Lake

**26.** 969 S.W.2d 528, 530 (Tex.App.—Fort Worth 1998, no pet.).

**27.** *Id.* at 532.

**28.** *Id.* (footnotes omitted).

**29.** *Id.* at 533.

**30.** 22 S.W.3d 669, 672 (Tex.App.—Fort Worth 2000, pet. ref'd) (op. on PDR).

Dallas area. Appellant exited the highway at the Hickory Creek–Lake Dallas exit and continued on the service road. When the service road split into another street, Appellant veered onto it before turning into a mobile home park. He drove to the back of the park and stopped in front of a trailer.

After stopping, Appellant did not heed Warren's request to get out of the truck. Warren got Appellant out of his truck, put him on the ground, and handcuffed him because he did not want him to run or fight. After handcuffing Appellant, Warren stood him up by his truck. Appellant had alcohol on his breath and his eyes were red, bloodshot, glassy, and had dilated pupils. Appellant swayed and staggered, and was argumentative and combative. When Officer Robert Feagins arrived on the scene six or seven minutes after Appellant was stopped, he asked Appellant, who had not been warned of his rights under *Miranda*, if he had been drinking. Appellant responded that he had six beers and that he had come from the Dallas Cowboys football game.[31]

■ Applying an "ad hoc" analysis to the circumstances of the present case in light of the applicable Fifth Amendment principles, we conclude that Appellant was not "in custody" for purposes of *Miranda* when he told Officer Cooper that he had had approximately five beers. When Cooper arrived at the scene of the collision at 2:38 p.m., off-duty officer Bull pointed out Appellant as the driver of the red vehicle. Cooper went over to Appellant to find out what had occurred at the accident and asked for his driver's license and insurance information. Cooper noticed that Appellant stumbled as he stood up from where he was sitting on the curb and had the smell of an alcoholic beverage, bloodshot and glassy eyes, and a wet area on his pants. At that point, Cooper had a duty to further investigate the collision and determine whether the Appellant's condition may have been the cause or a contributing factor.

After Appellant acknowledged the red car was his, Cooper asked him if he had had anything to drink, and Appellant responded that he had had approximately five beers. Cooper also testified in the affirmative before the jury when asked whether he asked Appellant how many beers he had had and further testified that Appellant responded that he had had about five beers. Cooper had not read Appellant his *Miranda* rights at that time. Cooper next asked Appellant to perform some field sobriety tests there at the roadside, but Appellant refused. Cooper thereafter arrested Appellant for DWI at 2:54 p.m.

During his conversation with Appellant, Cooper had probable cause to arrest Appellant for DWI when Appellant acknowledged that he was the driver of the red car and Cooper observed that Appellant stumbled, had a wet spot on his pants, and had the odor of alcohol. Under *Stevenson*, however, the fact alone that Appellant had become the focus of a DWI investigation for which there was probable cause to arrest did not render Cooper's questioning "custodial interrogation" subject to *Miranda*.[32]

It is recognized in *Dowthitt* that the manifestation of probable cause to arrest when "combined with other circumstances" may lead a reasonable person to believe that he is under restraint to the degree

31. *Id.* at 671–72.

32. 958 S.W.2d at 829.

associated with an arrest.[33] Unlike *Alford*, however, where, in addition to probable cause to make a DWI arrest, the suspect was handcuffed and placed on the ground before being asked whether he had been drinking and, unlike *Jordy* where the suspect lay on the ground and the officer called for an ambulance before asking how much he had drunk, there were no "other circumstances" in the present case showing that the questioning occurred beyond the investigatory stage.

Rather, as in *Berkemer*, Cooper's modest number of roadside questions over a short period of time were not the functional equivalent of formal arrest. Moreover, there was less restraint of Appellant than of the suspect in *Berkemer* in that, at the time Appellant responded that he had had approximately five beers, Cooper had not yet attempted to administer any field sobriety tests.

Just as *Abernathy*, *Waldrop*, and *Hutto* objectively viewed the circumstances presented and concluded that the roadside questioning of motorists suspected of DWI did not constitute "custodial interrogation" subject to the *Miranda* warning, we conclude that Appellant's statement was not given in a coercive, police-dominated atmosphere and was not the product of "custodial interrogation" subject to *Miranda*. Consequently, Appellant has not shown that the trial court erred in admitting the statement into evidence. Accordingly, we overrule Appellant's single point.

### Conclusion

Having overruled Appellant's single point, we affirm the trial court's judgment.

---

**33.** 931 S.W.2d at 255.