

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-262-CR

TRENT MICHAEL CAMPBELL                                        APPELLANT

V.

THE STATE OF TEXAS                                                    STATE

------------

FROM COUNTY CRIMINAL COURT NO. 10 OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

In a single point, Appellant Trent Michael Campbell appeals his conviction for driving while intoxicated ("DWI"). We affirm.

### II. Background

Southlake Police Sergeant James Polley and Officer David Aldridge were the only witnesses to testify at Campbell's DWI trial. The DVD from Officer Aldridge's vehicle's dashboard camera ("DVD") and the jail videotape of Campbell receiving his

statutory warning regarding giving a breath specimen were also admitted in evidence and published to the jury, along with a copy of the statutory warning signed by Campbell.

## A. Sergeant Polley's Testimony

Sergeant Polley testified that on March 29, 2008, around 1:15 a.m., he received information about a possible drunk driver. He proceeded to a nearby intersection to wait for the vehicle, a silver Mitsubishi, to drive by, and then he followed it, describing its manner of driving as follows:

> The Mitsubishi was traveling with both left side tires over the center—the center stripes, and then would drift back across and the right side tires would go. And on that street it's an old county road and it has bar ditches on either side and the shoulders are very narrow and dirt, so it pretty much goes road surface to dirt to bar ditch. And he put both right side tires into the—just about into the bar ditch and then would come back in, and he did that numerous times.

Sergeant Polley described the Mitsubishi's line-crossing as "all the way over to about where the hood ornament would be on a normal car. It would be two to three feet over onto the right-hand side or to the left of the center turn stripe." He followed the Mitsubishi for around a minute and a half—not more than a mile—during which time the Mitsubishi almost hit a culvert,[1] causing him to fear for

---

[1] ... Sergeant Polley testified,

One of the times that [Campbell] had driven off onto the right-hand side, they have an old culvert or bridge for when it rains and it's from the 30s, when the public works commission was going on and it's a solid concrete wall that comes up out of the ground about four feet. And I was absolutely scared that he was going to hit that, and I was hoping

the driver's safety "and for anybody else[] he happened to cross." He followed the Mitsubishi into a residential neighborhood, parked behind it, and waited several minutes for Officer Aldridge to arrive.[2] He testified that no one entered or exited the vehicle while he waited.

## B. Officer Aldridge's Testimony

Officer Aldridge testified that on March 29, 2008, during his 6 p.m. to 6 a.m. shift, there was a general broadcast about a possible drunk driver in a silver Mitsubishi, who was being followed first by a civilian on a cell phone and then by Sergeant Polley. Officer Aldridge did not see Campbell driving. He testified that he found the silver Mitsubishi parked on the residential street with its engine turned off; Sergeant Polley's vehicle was parked behind it.

Officer Aldridge found Campbell, either sleeping or passed out, in the silver Mitsubishi when he approached it. He testified that he noticed that Campbell smelled of alcohol; when Campbell woke up, he automatically reached for the ignition. Officer Aldridge told him to give him the keys and to step out of the car. He observed that Campbell slurred his words, and he testified that he felt that Campbell was a danger to himself or others. He put handcuffs on Campbell and placed him in the back seat of his patrol car, testifying that he detained Campbell "because [he]

_____

that he didn't, but at the last second he jerked it back to the left.

[2] ... Sergeant Polley testified that he did not approach the Mitsubishi because he was dressed in plain clothes, he did not have proper equipment to conduct an investigation, and he knew that Officer Aldridge was on his way.

3

knew it was going to be at least a public intoxication or minor in consumption." He also testified that he asked Campbell if he had had anything to drink that night and that Campbell replied that he had been drinking with some friends. Officer Aldridge admitted that he continued asking Campbell questions even though he was arresting Campbell, or at least detaining him, based on a public intoxication charge. Officer Aldridge then placed Campbell in his patrol car so he could speak with Sergeant Polley about what Sergeant Polley had seen.

Officer Aldridge subsequently administered the horizontal gaze nystagmus ("HGN") field sobriety test to Campbell at Sergeant Polley's prompting. He testified that the test resulted in six clues—the maximum—and then he placed Campbell under arrest for suspicion of DWI after Campbell refused to perform additional field sobriety tests. And he testified that based on his experience and observations that night, he came to the conclusion that Campbell had lost the normal use of his mental and physical faculties due to alcohol use, based on his demeanor, "the stumbling around, staggering, and his speech." Campbell refused to give a breath sample after he was transported to jail, and he received his *Miranda* warnings[3] after he received the statutory warning about the consequences of refusing a breath sample.

## C. Dashboard Camera DVD

The dashboard camera DVD corroborates Officer Aldridge's testimony. Specifically, it shows Officer Aldridge approaching the Mitsubishi with a flashlight,

---

[3] ... *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

4

shining the flashlight through the driver's side window, and opening the driver's side door. Some movement occurs inside the Mitsubishi, and Officer Aldridge tells Campbell to leave his car turned off, to give him the keys, and to step out of the vehicle. Campbell steps out of the vehicle on his own.

Officer Aldridge then asks Campbell how old he is. Campbell responds that he is nineteen. He asks Campbell if he has any identification on him, and Campbell responds that he does not. He asks Campbell how much he has had to drink tonight and whether it was a couple of beers. Campbell responds, "yes, sir." Officer Aldridge handcuffs Campbell and then asks him whether he knows that he is not old enough to be drinking. Campbell replies, "yes." Officer Aldridge then states, "But you did it anyway. Right?" Campbell says, "Right." He asks Campbell where he has been tonight; Campbell's response is unintelligible except for the word "house." Campbell then insists that he had not been driving. Officer Aldridge responds, "You just got through driving and parked right here," and then asks him off-camera, after informing him that he has been followed by police officers, "If you wasn't [sic] driving, who was?" Campbell's response is unintelligible. Off-camera, Officer Aldridge tells him to wait "right here" and the sound of the patrol car's door closing can be heard on the DVD.

When Officer Aldridge administers the HGN test to Campbell, Campbell demonstrates trouble following the instructions. Officer Aldridge asks him if he has been doing anything besides drinking, and Campbell says no. When asked if he has

been doing any drugs, Campbell states, "No drugs at all." As Officer Aldridge puts Campbell in the patrol car (off-screen), Campbell asks what the charge is. Officer Aldridge replies, "Driving while intoxicated," to which Campbell again argues that he had not been driving.

Campbell can clearly be heard to slur his words throughout, and he visibly sways during the administration of the HGN test. The DVD also shows that Officer Aldridge was not by himself—after he opens Campbell's car door, another uniformed officer approaches the vehicle and an officer in plain clothes walks to the passenger side of the vehicle. They both stand there while Officer Aldridge handcuffs Campbell.

**D. Jail Videotape**

The videotape of Campbell receiving his warnings at the jail and refusing to give a breath sample also shows that Campbell has trouble stating his birth date and that he refuses the offer of more sobriety tests. He clearly slurs his words and has trouble understanding what is going on, asking Officer Aldridge what he is signing [the statutory warning] after it has been read to him and a copy given to him to read along, and trying to bargain, "I will sign it if my mom can come pick me up." Officer Aldridge tells him more than once that he has to see a judge and set a bond before anyone can come pick him up. After he receives his *Miranda* warnings, he asks Officer Aldridge, "When can my lawyer come get me?"

**E. Procedural Posture, Findings, and Conclusions**

6

Campbell was charged with DWI, and he filed a motion to suppress, which the trial court denied after carrying the motion along during trial. A jury found Campbell guilty of DWI, and the trial court assessed a $500 fine, ninety days' confinement (suspended), and twenty-four months of community supervision.

After this appeal was filed, this court abated the case and remanded it to the trial court for findings of fact and conclusions of law regarding the voluntariness of Campbell's statements at issue. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (Vernon 2005); *Urias v. State*, 155 S.W.3d 141, 142 (Tex. Crim. App. 2004). The trial court's findings of fact parallel the information set forth above in our review of Sergeant Polley's and Officer Aldridge's testimonies.[4]

The trial court made the following conclusions of law: (1) Officer Aldridge had reasonable suspicion, based on specific articulable facts, to detain the defendant for investigation of whether he had been driving on a public roadway while intoxicated; (2) Having detained the defendant for further investigation, Officer Aldridge was entitled to ask a moderate number of questions to gather information to confirm or

---

[4] ... Finding #6 states,

After smelling alcohol on the defendant's person, and after the defendant admitted that he had been drinking, Officer Aldridge handcuffed the defendant and placed him in his patrol unit. Officer Aldridge conferred briefly with Sgt. Polley, then removed the defendant from the backseat of his patrol unit, and administered the horizontal gaze nystagmus test. The defendant exhibited all six clues of intoxication. Aldridge asked the defendant if he would submit to additional field sobriety tests, but he refused. [Record citations omitted.]

7

dispel his suspicions; (3) The defendant was not in custody for purposes of *Miranda* and Article 38.22 at the time he admitted he had been drinking, and his statement was not, therefore, the result of custodial interrogation; and (4) Further, the defendant's statement that he had been drinking was freely and voluntarily made, and was not the result of duress, threat, physical force or any other unlawful persuasion. This appeal was automatically reinstated upon submission of the trial court's findings of fact and conclusions of law.

### III. Motion to Suppress

In his sole point, Campbell argues that the trial court erred by denying his motion to suppress because he was arrested without a warrant and was not properly notified of his rights in violation of his constitutional and statutory rights, with specific reference to *Miranda* as codified by article 38.22 of the code of criminal procedure.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.). The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007);

8

*State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006). Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002). But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those fact findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818. We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law

9

applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## B. Warrantless Arrest

### 1. Applicable Law

Under the Fourth Amendment, a warrantless arrest is unreasonable per se unless it fits into one of a "few specifically established and well delineated exceptions." *Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S. Ct. 2130, 2135 (1993); *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005). A police officer may arrest an individual without a warrant only if probable cause exists with respect to the individual in question and the arrest falls within one of the exceptions set out in the code of criminal procedure. *Torres*, 182 S.W.3d at 901; *see* Tex. Code Crim. Proc. Ann. arts. 14.01–.04 (Vernon 2005 & Supp. 2009).

Probable cause for a warrantless arrest requires that the officer have a reasonable belief that, based on facts and circumstances within the officer's personal knowledge, or of which the officer has reasonably trustworthy information, an offense has been committed. *Torres*, 182 S.W.3d at 902. Probable cause must be based on specific, articulable facts rather than the officer's mere opinion. *Id.*; *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005). We use the "totality of the circumstances" test to determine whether probable cause existed for a warrantless arrest. *Torres*, 182 S.W.3d at 902. Additionally, probable cause is

evaluated based on the collective information known to the police, not just the stopping or arresting officer. *United States v. Hensley*, 469 U.S. 221, 229–33, 105 S. Ct. 675, 681–82 (1985); *Woodward v. State*, 668 S.W.2d 337, 344–46 (Tex. Crim. App. 1982) (op. on reh'g), *cert. denied*, 469 U.S. 1181 (1985); *see Armendariz*, 123 S.W.3d at 404–05; *Jackson v. State*, 745 S.W.2d 4, 8–9 (Tex. Crim. App.), *cert. denied*, 487 U.S. 1241 (1988); *see also Trimble v. State*, No. 02-08-00325-CR, 2009 WL 2138830, at *3 n.4 (Tex. App.—Fort Worth July 16, 2009, no pet.) (mem. op., not designated for publication) (distinguishing collective information exception from cases in which the information relied upon is from a citizen informant).

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts. *Terry v. Ohio*, 392 U.S. 1, 22, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). An officer conducts a lawful temporary detention when he or she has reasonable suspicion to believe that an individual is violating the law. *Ford*, 158 S.W.3d at 492. Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity. *Id*. at 492. This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists. *Id*.

11

## 2. Analysis

The record before us supports the trial court's conclusion that Officer Aldridge had reasonable suspicion to approach Campbell's vehicle and investigate, based on the dispatch about a possible drunk driver in a silver Mitsubishi that was followed by Sergeant Polley. *See Ford*, 158 S.W.3d at 492. And we conclude that, on this record, Officer Aldridge had probable cause after his initial investigation to make a warrantless arrest of Campbell for public intoxication—that is, the facts here show that Campbell was in a public place while intoxicated to the degree that he might endanger himself or another. *See* Tex. Penal Code Ann. § 49.02 (Vernon 2003); *Torres*, 182 S.W.3d at 902. Specifically, Officer Aldridge testified that with regard to his initial arrest or detention of Campbell for "at least a public intoxication," he had discovered Campbell sleeping or passed out in his vehicle that was parked on a residential neighborhood street and that Campbell smelled of alcohol, slurred his words, and immediately reached for his keys that were still in the ignition upon awakening. *See, e.g., Dickey v. State*, 552 S.W.2d 467, 468 (Tex. Crim. App. 1977) (concluding that appellant violated his probation by committing the offense of public intoxication when he became so intoxicated that he fell asleep in a car in front of a lounge in the middle of the night and noting, "[i]t is also possible that appellant could have awakened and taken it upon himself to drive himself and his companion home, which would have constituted an even clearer danger"). Additionally, Officer Aldridge had probable cause, after conferring with Sergeant Polley and performing

12

the HGN field sobriety test on Campbell, to arrest Campbell for DWI.  *See* Tex. Penal Code Ann. §§ 49.01, 49.04 (Vernon 2003) (stating that a person commits an offense if he is intoxicated—that is, does not have the normal use of his mental or physical faculties by reason of the introduction of alcohol into the body—while operating a motor vehicle in a public place); *see also Armendariz*, 123 S.W.3d at 404–05; *Trimble*, 2009 WL 2138830, at *3 & n.4.

The trial court specifically concluded that Campbell was not in custody for purposes of *Miranda* and article 38.22 when he admitted that he had been drinking. However, we review the trial court's legal ruling de novo, and Campbell admitted that he had been drinking more than once during his interaction with Officer Aldridge. What we must determine here, based on the totality of the circumstances, is at what point Officer Aldridge took Campbell into custody for *Miranda* purposes:  When he took Campbell's keys, when he handcuffed Campbell and placed him in the patrol car prior to administering the HGN test, or when he replaced Campbell back in the patrol car after the HGN test to take him to jail?

## C.  Miranda Warnings

Campbell contends that all evidence acquired after he was arrested without being given his *Miranda* warnings was "fruit of the poisonous tree" that should have been excluded under article 38.23(a) of the code of criminal procedure, and he specifically complains that the following should have been suppressed:

13

(1) ". . . Officer Aldridge asked Mr. Campbell if he had been drinking and Mr. Campbell answered he had at a friend[']s house."

(2) "Officer Aldridge then conducted the horizontal gaze nystagmus test which was another part of the investigation."

(3) "[At the jail] . . . Officer [Aldridge] started asking if he wanted to take other tests and stating this is not like the arrests you had before."

## 1. Initial Matters

We first note that the HGN test and Officer Aldridge's statement at the jail did not require suppression. This is because the Fifth Amendment applies only to incriminating evidence that is *testimonial* in nature. *Williams v. State*, 116 S.W.3d 788, 791 (Tex. Crim. App. 2003). To be testimonial, the communication must itself, explicitly or implicitly, relate a factual assertion or disclose information. *Id.* The court of criminal appeals has held that sobriety tests yield physical evidence of a suspect's mental and physical faculties, and thus, the results are not testimonial evidence that implicates *Miranda*. *Gassaway v. State*, 957 S.W.2d 48, 51 (Tex. Crim. App. 1997) (holding that field sobriety tests do not violate the privilege against self-incrimination). Specifically, the court of criminal appeals has reasoned that field sobriety tests are not testimonial because their results do not create "an express or implied assertion of fact or belief." *Id.*; *see also Arthur v. State*, 216 S.W.3d 50, 54–55 (Tex. App.—Fort Worth 2007, no pet.) ("[N]o Texas law requires that a suspect be warned . . . before the administration of a field sobriety test."). Therefore, the results of Campbell's HGN test were not subject to suppression.

14

Furthermore, the Fifth Amendment privilege against self-incrimination protected by the *Miranda* warnings and the statutory protections set out in article 38.22 specifically pertain to "statement[s] *of an accused* made as a result of custodial interrogation." Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (emphasis added); *see* U.S. Const. amend. V; *see also Miranda*, 384 U.S. at 476–77, 86 S. Ct. at 1629 (stating that the *Miranda* warnings are "prerequisites to the admissibility of any statement *made by a defendant*," (emphasis added)). Therefore, Officer Aldridge's statement to Campbell regarding Campbell's other arrests was not subject to suppression under *Miranda*.

## 2. Applicable Law

The need for *Miranda* warnings arises when a person has been subjected to a custodial interrogation. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. Article 38.22 of the code of criminal procedure generally precludes the use of statements that result from custodial interrogation absent compliance with its procedural safeguards. Tex. Code Crim. Proc. Ann. art. 38.22 (Vernon 2005); *Arthur*, 216 S.W.3d at 56.

Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. A person held for an investigative detention is not in custody. *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). A person is in custody only if, under the circumstances, a reasonable person would believe that his freedom of movement

15

was restrained to the degree associated with a formal arrest. *Id.* Persons temporarily detained pursuant to traffic stops are not in custody for the purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440, 442, 104 S. Ct. 3138, 3150–51 (1984) (determining that a motorist who was stopped for weaving on the road, subjected to a modest number of questions by a patrolman, and who performed a balancing test at a location visible to passing motorists, was not taken into custody for purposes of *Miranda*).

The court of criminal appeals has outlined some general situations that may constitute custody, including the following: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.2d at 252–55. In the first, second, and third situations, the restrictions upon freedom of movement must rise to the degree associated with an arrest as opposed to an investigative detention. *Id.* With regard to the fourth scenario, the officers' knowledge of probable cause must be manifested to the subject. *Id.*; *see also State v. Stevenson*, 958 S.W.2d 824, 828–29 (Tex. Crim. App. 1997) (holding appellant's statements admissible when the investigation was no more intrusive than in *Berkemer* and holding that even if appellant had become the focus of a DWI

16

investigation, this fact alone would not give rise to custody).  The standard for distinguishing between an investigative detention and an arrest is not always clear—both constitute seizures.  *Morris v. State*, 50 S.W.3d 89, 94 (Tex. App.—Fort Worth 2001, no pet.).

Furthermore, there is no bright-line rule that handcuffing a suspect always constitutes an arrest.  *See Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App.), *cert. denied*, 522 U.S. 894 (1997); *see also State v. Sheppard*, 271 S.W.3d 281, 283 (Tex. Crim. App. 2008) ("[A] person who has been handcuffed has been 'seized' and detained under the Fourth Amendment, but he has not necessarily been 'arrested.'").  Although handcuffing the suspect is not ordinarily proper during an investigative detention, it may be resorted to when reasonably necessary to effect the goal of the detention:  investigation, maintenance of the status quo, or officer safety.  *See Rhodes*, 945 S.W.2d at 117.  The degree of force employed by a police officer is just one of several factors that must be considered to determine whether a particular seizure of a person is an arrest or merely an investigative detention.  *State v. Moore*, 25 S.W.3d 383, 386 (Tex. App.—Austin 2000, no pet.). The nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, and the reaction of the suspect are all facts which bear on the issue.  *See id.* (citing 4 Wayne R. LaFave, *Search and Seizure* § 9.2(d) (3d ed.1996)).  The officer's opinion, while not determinative, is another factor to be considered.  *See id.* (citing *Amores v. State*, 816 S.W.2d 407, 412 (Tex. Crim. App. 1991)); *see also Rhodes v.*

17

*State*, 913 S.W.2d 242, 247 (Tex. App.—Fort Worth 1995), *aff'd*, 945 S.W.2d 115 (Tex. Crim. App. 1997).  It is also important to consider whether the officer actually conducts an investigation after seizing the suspect—that is, whether the officer briefly questions the suspect about his identity, his reason for being in the area, or similar reasonable inquiries of a truly investigatory nature as contemplated by *Terry v. Ohio*.  *See Amores*, 816 S.W.2d at 412; *see also Rhodes*, 945 S.W.2d at 119–20 (Meyers, J., concurring and dissenting) (discussing the differences between an arrest and an investigatory stop). Whether a seizure is an actual arrest or an investigative detention depends on the reasonableness of the intrusion under all of the facts.  *Morris*, 50 S.W.3d at 95.

### 3. Analysis

The only evidence potentially subject to suppression based on the testimony at trial was Campbell's statement to Officer Aldridge that he had been drinking with some friends, in response to Officer Aldridge's question as to whether Campbell had had anything to drink that night, and Campbell's statement that he had not been driving, in response to Officer Aldridge's question as to whether he had been driving. The only evidence potentially subject to suppression from the DVD, although not specifically complained of by Campbell,[5] would have been Officer Aldridge's questions about how much Campbell had had to drink and whether it was a couple

---

[5] Campbell broadly complains that all statements made after his arrest should have been suppressed, but he only specifically complains about the three items listed above.

18

of beers, to which Campbell replied, "yes"; Officer Aldridge's question about whether Campbell knew he was not old enough to be drinking, to which Campbell responded, "yes"; Officer Aldridge's follow-up question, "But you did it anyway. Right?" to which Campbell responded, "Right"; Officer Aldridge's question about where he had been that night—Campbell's response is mostly unintelligible; and Officer Aldridge's question that if Campbell was not the driver, who was, in response to Campbell's insistence that he had not been driving.

We have found one opinion, unpublished, that addresses whether an appellant is under arrest when an officer takes his car keys. *White v. State*, No. 08-06-00050-CR, 2007 WL 853134, at *1, 4 (Tex. App.—El Paso Mar. 22, 2007, no pet.) (not designated for publication). In *White*, the officer testified that he pulled the appellant over after he saw him speeding on the interstate around 11 p.m. *Id.* at *1. As he approached the pulled-over vehicle, the appellant rolled down his car window, and he saw the appellant's glazed eyes and smelled alcohol coming from the vehicle and on the appellant's breath. *Id.* In response to his questions, the appellant said that he had just left a nightclub where he had had three drinks; the officer noted that appellant had difficulty understanding questions and slurred his speech. *Id.* The officer asked the appellant to remove the keys from the ignition, explained to the appellant "that this was to prevent him from driving off and as a safety measure for his own safety," and placed the keys on top of the car. *Id.* The officer testified that the appellant was not under arrest at the time, but he was not free to leave as he

19

was suspected of DWI and he needed the appellant to wait there because he was not certified to conduct field sobriety tests and had to request that a DWI unit be sent to the scene. *Id.* The El Paso court concluded that the appellant was not in custody when the officer took his keys; rather, he was still being detained because the officer's suspicion that the appellant was intoxicated had not been dispelled or confirmed. *Id.* at *4. The court also noted that allowing the appellant to leave or retain his keys could have posed a danger to himself and others. *Id.*

The facts here are not those of a traditional traffic stop—Campbell's vehicle was parked when Officer Aldridge arrived on the scene, and Campbell was either passed out or asleep when Officer Aldridge opened the car door. Officer Aldridge gave Campbell no explanation for taking his car keys, and he retained the keys during their interaction. Nonetheless, Officer Aldridge's actions immediately after taking the keys and before placing Campbell in handcuffs appear to be part of a continuing investigation—he asked Campbell how old he was, whether he had any identification, and how much he had had to drink that night and whether it was a couple of beers. *See id.* at *1, 4. We conclude that Campbell was not in custody when Officer Aldridge took his keys or asked him questions prior to placing him in handcuffs. Therefore, Campbell's responses or affirmations—that he was nineteen, that he did not have identification on him, and that he had had a couple of beers—were not subject to suppression under article 38.22 or *Miranda*. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 3 (requiring custodial interrogation); *see also*

20

*Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. This is congruous with the trial court's conclusion that Officer Aldridge had reasonable suspicion to detain Campbell for further investigation and to ask a moderate number of questions to confirm or dispel his suspicions and that Campbell was not in custody when he admitted that he had been drinking.

However, some statements potentially subject to suppression remain because they occurred in response to Officer Aldridge's questions both after he took Campbell's keys and immediately after he placed Campbell in handcuffs: that he knew he was not old enough to be drinking, that he had been drinking with some friends or at a friend's house,[6] and that he had not been driving. The trial court does not appear to have considered these additional statements in its findings of fact or conclusions of law.

Officer Aldridge did not testify that he handcuffed Campbell for officer safety purposes, to continue his investigation, or to maintain the status quo. *See Rhodes*, 945 S.W.2d at 117. The handcuffing occurred after midnight on a residential street, and the DVD reveals that two other officers were on the scene with Officer Aldridge. *See Moore*, 25 S.W.3d at 386. Further, Officer Aldridge gave contradictory testimony, admitting on cross-examination that he continued to ask Campbell

---

[6] On the DVD, after handcuffing Campbell, Officer Aldridge asks him where he had been that night. Campbell's response on the DVD is mostly unintelligible except for the word "house." However, this question appears to match up with Officer Aldridge's testimony that Campbell said that he had been drinking with some friends.

21

questions even though he was arresting him based on public intoxication but also stating that Campbell was detained to investigate. *See id.* After handcuffing Campbell, he asked him additional questions beyond those that would normally be part of a *Terry* stop (i.e., identification questions) and then placed Campbell in his patrol unit. *See Amores*, 816 S.W.2d at 412. And he did not conduct any additional investigation directly involving Campbell's activities or identity until after speaking with Sergeant Polley, who prompted him to administer sobriety tests to Campbell.[7]

While handcuffing does not always constitute an arrest, we hold that it did here, in light of the circumstances under which Campbell was physically deprived of his freedom of action and under which a reasonable person would believe his freedom of movement had been significantly restricted. *See Dowthitt*, 931 S.W.2d at 254–55; *see also Alford v. State*, 22 S.W.3d 669, 671–72 (Tex. App.—Fort Worth 2000, pet. ref'd) (holding that appellant was in custody when he was stopped, placed on the ground, and handcuffed, and his response, that he had had six beers, when asked if he had been drinking by an officer who arrived on the scene seven minutes later, should have been suppressed since he was not given his *Miranda* warnings); *Jordy v. State*, 969 S.W.2d 528, 531–32 (Tex. App.—Fort Worth 1998, no pet.) (holding that appellant was subjected to a custodial interrogation following a traffic

---

[7] ... Defense counsel asked Sergeant Polley, "And did you do any additional investigation after [Campbell] was detained and handcuffed?" He responded, "Actually, now that you bring that up, I believe it was that I did instruct Officer Aldridge he probably needed to do SFSTs [standard field sobriety tests] for DWI at which point in time that's when he got started."

accident when he laid down on the ground and the officer called an ambulance before asking appellant how much he had had to drink, to which appellant replied, "A lot."). *But see Rhodes*, 945 S.W.2d at 117–18 (holding that incident was temporary investigative detention when officer testified at suppression hearing that he was not arresting Rhodes when he handcuffed him and that he handcuffed him primarily out of concern for officer safety—it was dark, the area was high-crime, and officer was alone with suspect); *Arthur*, 216 S.W.3d at 53, 57–58 (holding that appellant's statements were not a product of custodial interrogation when officer saw appellant's vehicle drifting and speeding, initiated a traffic stop and asked some questions about whether she had had anything to drink—which she answered inconsistently and in a loud, moderately slurred voice—and administered three sobriety tests and a portable breath test before arresting her); *Hernandez v. State*, 107 S.W.3d 41, 47–48 (Tex. App.—San Antonio 2003, pet. ref'd) (concluding that appellant's statement that he had consumed nine beers was made during investigatory detention after officer saw appellant speeding and weaving between lanes without signaling, pulled him over, noticed the smell of alcohol and appellant's bloodshot eyes, and administered three field sobriety tests, all prior to full custodial arrest); *Wappler v. State*, 104 S.W.3d 661, 668 (Tex. App.—Houston [1st Dist.] 2003) (concluding that it was reasonable for the officer to secure appellant in handcuffs when appellant was uncooperative and belligerent, so that officer could complete his DWI investigation), *rev'd on other grounds*, 138 S.W.3d 331 (Tex. Crim.

App. 2004); *Lewis v. State*, 72 S.W.3d 704, 708–13 (Tex. App.—Fort Worth 2002, pet. ref'd) (distinguishing *Jordy* and *Alford* as presenting "other circumstances" requiring *Miranda* when their facts went beyond the roadside questioning and sobriety tests found in DWI temporary investigation cases).

The failure to suppress Campbell's statements made after he was arrested for public intoxication without his *Miranda* warnings constituted error. Additionally, we are concerned about the testimony that Officer Aldridge gave after he testified that he arrested Campbell based on public intoxication and that Campbell was not free to leave:

> Q. Okay. And all the time while you are at least arresting him based upon a public intoxication, correct?
>
> A. Uh-huh.
>
> Q. Okay. Now, typically if you do—if you arrest somebody, aren't you supposed to immediately give them their Miranda rights?
>
> A. No.
>
> Q. Okay. So you are free, under your training, to continue to interrogate an individual without giving Miranda warnings?
>
> A. We can ask questions.
>
> Q. You can ask questions without advising them of the right to remain silent?
>
> A. Correct.
>
> Q. Okay. And this is from your training?
>
> A. Yes.

24

Q. So you could arrest anyone that you think has committed a crime and continue to ask them questions without giving the Miranda warnings?

A. No. It's going to depend on the offense, you know. A public intoxication or minor in consumption [sic], I don't have to read them Miranda.

Q. So you don't always have to read Miranda rights when you put somebody under arrest?

A. Right.

Wrong. *See Wicker v. State*, 740 S.W.2d 779, 786 (Tex. Crim. App. 1987) ("*Miranda* has since been extended to cover custodial interrogation of one suspected of even a misdemeanor traffic offense."), *cert. denied*, 485 U.S. 938 (1988); *Alford*, 22 S.W.3d at 671–73 (stating same).

Because we have found error, we must perform a harm analysis, and because we determine that the error is constitutional, we apply rule 44.2(a). *See* Tex. R. App. P. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 776–77 (Tex. Crim. App. 2003) (applying rule 44.2(a) analysis to *Miranda* violation), *cert. denied*, 542 U.S. 905 (2004). We must reverse unless we determine beyond a reasonable doubt that the trial court's failure to suppress these statements did not contribute to Campbell's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001).

In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction.

25

*Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied,* 526 U.S. 1070 (1999). Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution." *Id.* at 586.

The source of the error was Officer Aldridge's misunderstanding of when to give *Miranda* warnings. He asked three questions after arresting Campbell and prior to giving him the *Miranda* warnings that are relevant to the DWI charge,[8] which elicited the following incriminating information from Campbell that was presented before the jury: Campbell had been drinking that night with some friends, and he denied that he had been driving, contrary to what the DVD showed and to Sergeant Polley's testimony.

---

[8]... That is, whether he had been drinking, where he had been that night, and who was driving if Campbell was not the driver.

26

During closing arguments, the State waived its opening. During its rebuttal, the prosecutor first referenced Campbell's slurred speech that the jury saw in the published exhibits and then briefly referenced Campbell's statements, stating, "He told—Trent Campbell said he was drinking that night. He told Officer Aldridge[, ']I've been drinking at a friend's house.[']" However, the State placed the most emphasis during its rebuttal on Campbell's driving, described by Sergeant Polley, and on Campbell's overall intoxicated demeanor, described by Officer Aldridge.

As recounted above, besides Campbell's statement through Officer Aldridge's testimony that he had been drinking with his friends, the jury heard testimony from Sergeant Polley about Campbell's hazardous driving, including that Campbell's vehicle almost ended up in a bar ditch numerous times, that Campbell's vehicle almost hit a culvert and crossed the center line several times, and that he feared for the driver's safety and the safety of others because of this. The jury also heard his testimony that no one entered or exited the vehicle after it came to a stop. And the jury heard Officer Aldridge's testimony about finding Campbell either asleep or passed out in the same vehicle, Campbell's smell of alcohol and word-slurring, and Campbell's performance on the HGN test. The jury heard Campbell's slurred speech when the exhibits were played at trial and saw Campbell pause before reciting his birth date on the jail videotape. And because Campbell's response to Officer Aldridge's question regarding whether he had had a couple of beers that

27

night occurred before he was taken into custody, the jury was free to consider this statement in conjunction with all of the other evidence.

In light of all of this other evidence, the probable impact on the jury of Campbell's statement that he had been drinking at a friend's house was minimal. That is, the jury could have concluded beyond a reasonable doubt that Campbell had operated the silver Mitsubishi while not having the normal use of his mental or physical faculties by reason of the introduction of alcohol into his body from the officers' testimony, from Campbell's demeanor on the DVD and videotape, and from Campbell's own statement prior to being taken into custody that he had been drinking alcohol that night, even if Campbell had never made the statement that he had been drinking with friends. Furthermore, declaring the error harmless here is unlikely to encourage the State to repeat it with impunity in light of the specific facts here and with regard to the fine line between investigative detentions, which do not require *Miranda* warnings, and custodial interrogations, which do.

Therefore, after carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's error did not contribute to Campbell's conviction or punishment. Tex. R. App. P. 44.2(a). And because we hold that the error in failing to administer his *Miranda* warnings did not contribute to Campbell's conviction or punishment beyond a reasonable doubt under rule 44.2(a), we need not also analyze whether admission of the same statement in violation of section 38.22 violated Campbell's substantial

28

rights under rule 44.2(b).  *See* Tex. R. App. P. 47.1; *see also Woods v. State*, 152 S.W.3d 105, 118 (Tex. Crim. App. 2004) (stating that the erroneous admission of an appellant's statement in violation of article 38.22 amounts to nonconstitutional error), *cert. denied*, 544 U.S. 1050 (2005).  We overrule Campbell's sole point.

## IV.  Conclusion

Having overruled Campbell's sole point, we affirm the trial court's judgment.


BOB MCCOY
JUSTICE


PANEL:  LIVINGSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DAUPHINOT, J. filed a concurring opinion.

PUBLISH

DELIVERED: June 17, 2010

29



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 2-08-262-CR

TRENT MICHAEL CAMPBELL                                        APPELLANT

V.

THE STATE OF TEXAS                                                STATE

------------

FROM COUNTY CRIMINAL COURT NO. 10 OF TARRANT COUNTY

------------

## CONCURRING OPINION

------------

I concur in the majority's thoughtful and well reasoned opinion. A new folk myth appears to have developed among law enforcement officers, judges, and lawyers that driving while intoxicated (DWI) is an exception to the protections of the Fourth and Fifth Amendments to the Constitution of the United States and to the protections of the comparable portions of our state constitution and code of criminal

procedure.  I write separately to point out the confusion that has arisen in our law regarding what the holding in *Miranda v. Arizona*[1] means.

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  ***By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.***[2]

In *Hiibel v. Sixth Judicial Dist. Court*,[3] the United States Supreme Court clarified the parameters of the investigative detention and interrogation.  In an analysis similar to that employed in *Crawford v. Washington*,[4] the Court concentrated on whether the questioning during an investigative detention was testimonial:

> To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled.
>  . . . . "[T]o be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information."  Stating one's name may qualify as an assertion of fact relating to identity.  Production of identity documents might meet the definition as well.  As we noted in *Hubbell,* acts of production may yield testimony establishing "the existence, authenticity, and custody of items [the police seek]."
>
>  . . . .

---

[1] ... 384 U.S. 436, 86 S. Ct. 1602 (1966).

[2] ... *Id.* at 444, 86 S. Ct. at 1612 (emphasis added).

[3] ... 542 U.S. 177, 124 S. Ct. 2451 (2004).

[4] ... 541 U.S. 36, 38, 124 S. Ct. 1354, 1357 (2004).

2

As we stated in *Kastigar v. United States*, the Fifth Amendment privilege against compulsory self-incrimination "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used."[5]

The three prongs of the test to trigger the Fifth Amendment, then, are that the statement is testimonial, incriminating, and compelled. The *Miranda* court held that a statement is compelled when it is in response to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."[6]

Based on Sergeant Polley's testimony, he had probable cause to arrest Appellant Trent Michael Campbell for reckless driving or a traffic violation. As the majority so cogently points out, when Officer Aldridge walked up to Appellant who was sleeping, Aldridge had probable cause to arrest Appellant for public intoxication. Any claim that further investigation was necessary regarding the reckless driving is specious. Appellant was finished driving for the night. When Appellant attempted to reach for the keys in the ignition, the officer took the keys away and told him to get out of the car. Not only should it have been clear to Appellant that his movements were restricted to those permitted by the police officers, had he tried to leave, he would have been guilty of a criminal offense.

---

[5] *Hiibel*, 542 U.S. at 189–90, 124 S. Ct. at 2460 (citations omitted).

[6] 384 U.S. at 444, 86 S. Ct. at 1612.

3

Section 38.04 of the penal code provides that a person commits an offense if he intentionally flees from a person he knows is a peace officer attempting lawfully to arrest or even merely to detain him.[7] In Texas and under the mandate of section 38.04, a person whom a police officer decides to detain is never free to leave. No matter how temporary the detention, that person is not free to leave until the officer decides to allow him to leave. Clearly, when a peace officer in Texas decides to detain a person, that person has been "***deprived of his freedom of action* in [a] significant way**,"[8] and to attempt to do anything other than submit to the officer's show of authority constitutes a crime punishable by incarceration. As I have stated elsewhere,

> Although courts speak of a person's being free to leave when a police officer approaches him, courts also hold fairly regularly that walking or running away when an officer approaches provides reasonable suspicion for the officer to detain the person. It is, indeed, a lose, lose situation for any person a police officer wants to speak to. He is free to leave, unless he leaves.[9]

To claim that Appellant was free to leave after the police cars converged on the scene would be a fiction totally unsupported by the record. And as the majority so astutely notes, Appellant was going to jail for something. The only question was what.

---

[7] ... Tex. Penal Code Ann. § 38.04 (Vernon Supp. 2009).

[8] ... 384 U.S. at 444, 86 S. Ct. at 1612 (emphasis added).

[9] ... *State v. Woodard*, No. 02-09-052-CR, 2010 WL 1268035, at *14 (Tex. App.—Fort Worth April 1, 2010, pet. filed) (Dauphinot, J., dissenting).

Courts and lawyers and commentators have spent years trying to construe exactly what the *Miranda* court meant by

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. ***By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.***[10]

Perhaps it is time to conclude that sometimes courts mean exactly what they say: the prosecution may not use any statement stemming from questioning initiated by law enforcement officers when a person is not free to walk, or to run, or to drive away, unless the person has been warned on the spot that he does not have to answer the questions, can have a lawyer present to give him advice, even if he is so poor that the government has to pay for the lawyer, and that he can stop answering questions anytime he decides to stop.

Maybe the *Miranda* court meant just exactly what they said. And under Texas law, a person must be warned anytime the police detain him and start asking questions because that person is never free to leave. And if he had been free to leave, deciding to walk away would have put an end to that freedom.

Because in the case before us the officer candidly admitted that he believed DWI, public intoxication, and minor in possession offenses to be exceptions to the mandates of the prohibitions against self-incrimination, and because he acted

---

[10] ... 384 U.S. at 444, 86 S. Ct. at 1612 (emphasis added).

accordingly, the trial court should have suppressed the statements that were testimonial and incriminating (although the *Miranda* court specifically referred to both inculpatory and exculpatory statements).[11] But because the remaining evidence of guilt is both overwhelming and untainted by the improperly admitted statements, I join the majority's conscientiously accurate and legally sound opinion.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED: June 17, 2010

---

[11] *See id.*