

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00037-CR
No. 02-18-00038-CR

_____

CARLA MAE SOLAYAO, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 5
Tarrant County, Texas
Trial Court Nos. 1513977, 1513978

---

Before Sudderth, C.J.; Pittman and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

Appellant Carla Mae Solayao's spouse called 911 after she hit him in the face during an argument. She tried to stop him from making the call. Arlington police officers were dispatched to the scene and spoke with both parties. Solayao subsequently sought the exclusion of her statements to the officers under code of criminal procedure article 38.22 and requested a jury instruction to that effect,[1] both of which were denied by the trial court. The jury convicted her of assault causing bodily injury to a family member[2] and interfering with an emergency call,[3] and the trial court sentenced her to 90 days' confinement for each conviction, to run concurrently, then suspended her sentences and placed her on 12 months' community supervision. *See* Tex. Penal Code Ann. § 12.21 (West 2011) (stating that a Class A misdemeanor punishment may include a fine not to exceed $4,000, confinement in jail for up to a year, or both); Tex. Code Crim. Proc. Ann. art. 42A.053(a)(1) (West 2018) (stating that

---

[1]*See* Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2018) (providing for a jury instruction, in appropriate cases, with regard to fact issues on whether evidence was obtained in violation of the state or federal constitutions or statutes).

[2]*See* Tex. Penal Code Ann. § 22.01(a)(1) (West Supp. 2018) (stating that a person commits an offense if he or she intentionally, knowingly, or recklessly causes bodily injury to another, including his or her spouse).

[3]*See* Tex. Penal Code Ann. § 42.062(a) (West 2016) (stating that a person commits an offense if he or she knowingly prevents or interferes with another individual's ability to place an emergency call to a law enforcement agency).

a trial court may suspend the imposition of a sentence and place the defendant on community supervision).

In two issues, Solayao complains that the trial court erred by admitting the officers' testimony about her statements and by refusing her requested jury instruction. We affirm.

## II. Background

On September 18, 2017, at around 10:30 p.m., James Hill, Solayao's husband, called 911 to report a domestic violence incident. According to Hill, Solayao was attacking him and had hit him, knocking off his glasses.[4] After Hill told Solayao that the police had been called, she could be heard crying in the background.

Hill testified at trial that he and Solayao had been married for two years[5] and had a nineteen-month-old daughter. He called the police because Solayao had hit him in the face twice during an argument about their child. The second strike broke his glasses, cutting the bridge of his nose. When he used his cell phone to try to call the police, Solayao tried to knock the phone out of his hand a few times, pulled and

---

[4]Solayao objected to the 911 call's admission during trial but does not complain of its admission on appeal.

[5]Hill testified that he had filed the application to adjust Solayao's immigration status from fiancée to permanent resident five days after their wedding but that her status had remained pending at the time of the incident. Three weeks after Solayao's arrest, Immigration and Customs Enforcement issued a hold on her.

clawed at his arm, and eventually got on top of the couch and tried to get onto his back so that she could pull the phone away.[6]

Arlington Police Officers Jacob Burton and Jimmy May, along with Corporal Jacob Williams, who was providing field training supervision of Officer Burton,[7] responded to the domestic disturbance call approximately five minutes after they received the information from dispatch. When they arrived at the scene, both parties were inside the residence. Officer Burton immediately separated the parties, asking Hill to step outside while Solayao stayed inside the couple's apartment with Officer May. Officer May performed a quick safety check of the residence to make sure that there was no one else inside. Officer Burton interviewed Hill first, then Solayao, and

---

[6]Hill also testified that Solayao had previously assaulted him, had pushed him down the stairs in February 2017, and had bent his fingers back in August 2017. He filed for divorce after the September 18, 2017 assault.

The trial court admitted screenshots of some August 2017 text messages between the parties and allowed these to be published to the jury. Solayao objected to the admission of the screenshots, but she does not complain about their admission on appeal. On August 22, 2017, Hill received text messages from Solayao that stated, "[S]ince I have no family here[,] I am not scare[d] to die here or arrest or whatever," and "[I]f they will arrest me[,] I will make sure I've done something bad." On August 28, 2017, less than a month before the instant altercation, Hill received a Facebook message from Solayao that stated, "Goodbye to you," and had a photo of her holding a butcher knife.

[7]Officer Burton was commissioned as a police officer approximately three weeks before the September 18, 2017 incident. According to Corporal Williams, new recruits ride with a field training officer for about 18 weeks after they finish the academy.

observed—as Corporal Williams did[8]—that Hill was bleeding from a fresh cut on his nose. The police took photos of Hill's injuries, which were admitted into evidence and published to the jury at trial. The photographs show a small cut on the bridge of Hill's nose and a scratch on his arm.

Officer Burton said that Hill was visibly upset, seemed scared, and kept taking off his glasses, which were broken, and rubbing his eye. When asked, Hill told Officer Burton that his eye hurt. Hill told him that he and Solayao had been engaged in a verbal argument that became physical when she hit him with her open hand and broke his glasses, scratched him, and jumped on him to stop him from calling the police.[9]

Officer Burton said that after hearing Hill's version, he switched places with Officer May and spoke with Solayao, who was sitting inside the apartment on the couch. He described Solayao as extremely calm, "as if nothing was going on," and said that she had no visible injuries.

The trial court held an article 38.22 hearing outside the jury's presence. At that hearing, Officer Burton stated that when the police entered the parties' residence, Officer May told Solayao to sit on the couch, and Officer Burton took Hill outside to

---

[8]Corporal Williams stood next to Officer Burton for the entire investigation and made the same observations.

[9]Solayao raised a hearsay objection to these statements at trial but does not complain about them on appeal.

ask him questions. After Officer Burton switched places with Officer May to talk with Solayao, he asked Solayao what had happened as part of his interview to determine probable cause. Officer Burton said that no one in the household was free to go, that everyone was detained while he conducted his investigation, and that no one under detention would have been free to move around the house during the investigation. He did not give *Miranda* warnings[10] to Solayao before asking her what had happened.

Officer Burton said that when he asked Solayao what had happened, he was standing next to the couch where she was sitting. In response to his query, Solayao told him that she and Hill had been in an argument and had called each other names before she smacked him on the forehead with her open hand. Hill had called her crazy, which had angered her and caused her to hit him. She also told Officer Burton that because Hill kept telling her that he was going to call the police, she tried to take the phone from him and grabbed his arm to keep him from calling. At that point, Officer Burton believed he had sufficient probable cause to make an arrest and discussed it with Corporal Williams, who agreed.[11] Officer Burton then arrested Solayao.

---

[10] *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[11] After the article 38.22 hearing and before the jury, Corporal Williams said that he had determined that Solayao was the principal aggressor after seeing Hill's injuries, hearing Solayao's admission that she had caused the injuries, and not hearing from Solayao regarding whether Hill had assaulted her first. Corporal Williams said that

At the conclusion of the article 38.22 hearing, the prosecutor argued that Solayao's statements to Officer Burton were admissible because she was not in custody—she had been in her own home and not handcuffed—and she had not been interrogated. Solayao responded that her freedom of movement had been substantially curtailed, rendering her in custody when she had been directed and placed in a particular space and not allowed to move from it, and that she had been interrogated because her statements to Officer Burton were in response to his questions. The trial court ruled that at that point in time, Solayao had not been in custody and that her statements to the officer would be admitted.

Before the jury, Officer Burton testified about Solayao's statements set out above and stated that after interviewing her, he determined that he had probable cause to arrest her for both assault and interference. Solayao was placed in handcuffs, escorted to a patrol vehicle, searched, and transported to jail. On cross-examination, Solayao's counsel asked the officer why she had been placed on the living room couch, and he replied, "She was placed there [by Officer May] as a -- it was deemed a safe place for that party to sit." Solayao's statements were made in response to his questions, and he did not warn her that she had a right to remain silent prior to asking any questions.

---

Solayao had demonstrated for the officers the slap that she gave Hill. He determined that Solayao should be arrested based on the corroboration of both parties' accounts and the physical evidence of Hill's injury.

On redirect, the prosecutor asked Officer Burton why both parties had been detained when he arrived at the scene. Officer Burton replied, "We need to secure a scene in a domestic situation. We make sure that everyone inside the house is accounted for. And we freeze the scene. No one can leave; no one can enter. And then we do our primary investigation with those parties detained" for officer safety and for party safety. On recross, however, Officer Burton agreed that nothing within the scope of officer safety would have prevented him from informing Solayao that she had the right to remain silent.

Corporal Williams testified that during his nine years as an Arlington police officer, he had responded to 10 to 40 domestic violence cases a week; Officer Burton said that he typically responded to 5 to 10 domestic violence calls in a normal week. Officer Burton explained that domestic violence calls were different from other offenses because, due to the family dynamic, they tended to escalate and become heated faster than in most other scenarios. He stated that in a domestic disturbance investigation, the police separate each party, talk to the complainant, then talk to the other party, and make a determination of what happened. In their discussion with each party, officers looked for "clarity, continuation of the story, if there's any breaks. Usually when someone's being more in-depth and more specific, they're more likely to be the one telling the truth." Officer Burton stated that the officers would derive

probable cause from the parties' statements.[12]  He added, "There's never one type of victim in a domestic [disturbance]."

At the conclusion of evidence, Solayao requested an article 38.22 instruction and submitted a proposed charge.  The trial court denied her request, and the jury found her guilty of both offenses.

### III. Discussion

Code of criminal procedure article 38.22 sets out the state equivalent of *Miranda* rights with regard to statements made "as a result of custodial interrogation" and provides that such statements may not be used against an accused unless there has been compliance with procedural safeguards.  *See* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2(a)(1)–(5), 3(a)(1)–(2) (West 2018).  However, article 38.22 does not preclude the admission of a statement that does not stem from custodial interrogation.  *Id.* § 5.

Solayao argues that because she was not free to leave when she spoke with the police, article 38.22's requirements applied to her statements and she should have received a jury instruction on those requirements.

---

[12]Corporal Williams reiterated that the police's primary concern in responding to a domestic violence call was to separate the parties and make sure everything was safe, followed by interviewing both parties to determine whether the facts showed an offense for which the police needed "to take action or arrest."  Corporal Williams said that in addition to speaking with the parties, the determination could be made from physical clues, such as whether either party had an injury and whether the residence was disturbed.

The State responds that although Officer Burton admittedly did not administer the statutory warnings to Solayao, she was not in custody when she was questioned by him, and therefore the trial court properly admitted her statements into evidence and denied her requested jury instruction.

We generally review the trial court's admission of evidence for an abuse of discretion, *see White v. State*, 549 S.W.3d 146, 157–58 (Tex. Crim. App. 2018), but in reviewing a trial court's ruling on a *Miranda*-type violation claim, we conduct a bifurcated review, giving almost total deference to the trial court's rulings on questions of historical fact and application-of-law-to-fact questions that turn on credibility and demeanor while reviewing de novo the trial court's rulings on application-of-law-to-fact questions that do not turn upon credibility and demeanor. *Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App.), *cert. denied*, 568 U.S. 815 (2012); *see also Herrera v. State*, 241 S.W.3d 520, 526–27 (Tex. Crim. App. 2007) (explaining review of "custody" determinations under the bifurcated standard).

## A. Custody versus Detention

"Custodial interrogation" is a term of art defining the questioning of a person by law enforcement officers after that person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *See Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. But a person held for an investigative detention is not in custody. *See Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). A person is in custody only if, under the circumstances, a reasonable person would

believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Id.*

Generally, when a person voluntarily accompanies law enforcement to a certain location, even though he knows or should know that law enforcement suspects that he may have committed or may be implicated in committing a crime, that person is not restrained or "in custody." *Miller v. State*, 196 S.W.3d 256, 264 (Tex. App.—Fort Worth 2006, pet. ref'd) (citing *Livingston v. State*, 739 S.W.2d 311, 327 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1210 (1988)). More specifically, so long as the circumstances show that a person is acting only upon the invitation, request, or even urging of law enforcement, and there are no threats, either express or implied, that he will be taken forcibly, the accompaniment is voluntary, and such person is not in custody. *Id.* (citing *Anderson v. State*, 932 S.W.2d 502, 505 (Tex. Crim. App. 1996), *cert. denied*, 521 U.S. 1122 (1997)); *see also Meek v. State*, 790 S.W.2d 618, 621–22 (Tex. Crim. App. 1990) (citing *Shiflet v. State*, 732 S.W.2d 622, 631 (Tex. Crim. App. 1985), for the proposition that a person is not in custody when he voluntarily accompanies an officer to a location and knows or should know that he is a suspect in the crime being investigated).

The court of criminal appeals has identified several scenarios that may constitute custody, including the following: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a

situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest[13] and law enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.2d at 255. In the first, second, and third situations, the restrictions upon the suspect's freedom of movement must rise to the degree associated with an arrest as opposed to an investigative detention. *Id.* With regard to the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect. *Id.*

Further, the degree of force employed by the police officer, the nature of the crime under investigation, the degree of suspicion, the location of the seizure, the time of day, and the suspect's reaction are all facts that bear on the issue of whether a particular seizure is an arrest or merely an investigative detention. *Campbell v. State*, 325 S.W.3d 223, 234 (Tex. App.—Fort Worth 2010, no pet.). The officer's opinion, while not determinative, is another fact to be considered, as well as whether the officer actually conducts an investigation. *Id.* The duration of time, while not itself dispositive, is another important fact in determining whether custody has occurred. *Dowthitt*, 931 S.W.2d at 256. Whether a seizure is an arrest or an investigative

---

[13]Probable cause to arrest exists at the moment that the facts and circumstances within the arresting officer's knowledge of which he has reasonably trustworthy information would warrant a reasonable and prudent man in believing that a particular person has committed or is committing a crime. *Miller*, 196 S.W.3d at 265 n.3 (citing *Jones v. State*, 493 S.W.2d 933, 935 (Tex. Crim. App. 1973)).

detention depends on the reasonableness of the intrusion under all of the facts. *Campbell*, 325 S.W.3d at 234.

## B. Analysis

Solayao argues that she was in custody when the police officers "ordered [her] to sit on the couch and remain there." But the issue is not whether Solayao thought she was in custody, but whether a reasonable person under the circumstances of this case would have believed that her freedom of movement was restrained to the degree associated with a formal arrest, *see Dowthitt*, 931 S.W.2d at 255, particularly when nothing in this record reflects that Solayao sought to leave the couch or living room during the investigation or suggests that she thought she was in custody. Rather, even though Solayao should have known that Officer Burton suspected her of assault—in light of Hill's having called 911, the wound on Hill's nose, and Hill's having spoken to Officer Burton first—this record is consistent with Solayao's having voluntarily sat down on the couch in response to Officer May's request while awaiting her chance to tell her side of the story.[14] *See Miller*, 196 S.W.3d at 264; *cf. Bates v. State*, 494 S.W.3d 256, 268 & n.9, 269–72 (Tex. App.—Texarkana 2015, pet. ref'd) (explaining that while Bates's statement in response to the policemen's first asking him what was going on at the scene was a consensual interaction, under the case's circumstances, Bates was in custody after he was handcuffed and secured in a police car because he clearly was not

---

[14]The record does not reflect whether there was anywhere else in the parties' living room to sit and wait.

free to leave). The record does not reflect that there were any express or implied threats to Solayao by the police of what might happen if she did not sit on the couch to wait, or any manifestation by Officer Burton that he had developed probable cause before he asked Solayao any questions or of an intent to arrest her until after he concluded his investigation. *See Miller*, 196 S.W.3d at 264. The record likewise neither reflects how long Solayao had to wait before Officer Burton came to talk with her nor whether Solayao had some other engagement that evening that she was prevented from attending because of the investigation. *See Campbell*, 325 S.W.3d at 234.

Under the circumstances presented here, we cannot say that the investigative detention presented such an unreasonable intrusion on Solayao's freedom of movement as to amount to a formal arrest. Accordingly, we conclude that the trial court did not abuse its discretion by admitting into evidence her statements to Officer Burton over her article 38.22 objection. Accordingly, we overrule Solayao's first issue.[15]

---

[15]We note, however, that even if the trial court had abused its discretion by admitting Solayao's statements, the jury could have determined from the remaining evidence—Hill's testimony, the photographs of his injuries, and the 911 call—that Solayao was the culprit in the assault and interference cases. *See* Tex. R. App. P. 44.2(b) (stating that when reviewing nonconstitutional error, the court disregards the error if it did not affect the appellant's substantial rights); *Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002) (stating that in a nonconstitutional-error-based review of harm, the court reviews the record as a whole, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case, as well as jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and—if applicable—voir dire).

Because we have concluded that the trial court did not abuse its discretion by admitting her statements, the trial court likewise did not err by refusing her request for a jury instruction with regard to those statements. Thus, we overrule her second issue. *See Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (stating that when reviewing a jury charge issue, the court must first determine whether error occurred; if no error occurred, then the court's analysis ends).

## IV. Conclusion

Having overruled both of Solayao's issues, we affirm the trial court's judgments.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: December 13, 2018