

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-12-00365-CR

The **STATE** of Texas,
Appellant

v.

Phyllis Jean **WHITTINGTON**,
Appellee

From the County Court at Law, Kerr County, Texas
Trial Court No. CR12-0063
Honorable Spencer W. Brown, Judge Presiding

Opinion by:    Catherine Stone, Chief Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  March 6, 2013

REVERSED AND REMANDED

Phyllis Whittington was charged with driving while intoxicated.  After a hearing, the trial court granted Whittington's motion to suppress evidence of the arrest and the patrol-car videotape.  On appeal, the State challenges the trial court's rulings regarding: (1) the point at which Whittington was arrested; (2) the identification and corroboration of the informant; and (3) the existence of probable cause to arrest Whittington.  Because we reverse the trial court's determination on the timing of Whittington's arrest, we will remand to the trial court to address

the State's third issue of whether probable cause existed after the field sobriety tests were administered.

## BACKGROUND

This appeal stems from a collision involving Whittington and Michael Huddleston. Around 9:00 p.m. one evening, Huddleston's vehicle approached behind Whittington's black Lexus sports utility vehicle (SUV), which was stopped in the roadway for no apparent reason. Huddleston stopped several yards behind Whittington's SUV. Whittington then began to reverse and, despite his honking, hit Huddleston's car. Whittington seemed unaware of the collision and drove away. Huddleston followed and called the police. The police dispatcher told Huddleston to continue following the SUV, so he did.

During this time, Officer Dutchover was dispatched to the 1300 block of Park Street regarding a two-vehicle accident. Officer Dutchover's incident report[1] stated dispatch related that a caller driving a 2009 Mercedes with license plate CV5X222 had been hit by a black SUV with license plate CV5252, and that the SUV was attempting to flee the accident scene. Officer Dutchover's report also stated dispatch advised him that the SUV pulled into the driveway of a house at 1312 Park Street. Officers Dutchover and Haas soon arrived at the residence and found Whittington in the driver's seat of a black Lexus SUV parked in the driveway. Huddleston was parked across the street from the residence when the officers arrived, but the officers had not yet identified him as the caller.

---

[1] Although the trial court did not find Officer Dutchover's testimony during the suppression hearing to be credible because Officer Dutchover could not clearly remember the events that transpired, the trial court made no findings relating to Officer Dutchover's incident report. Because the incident report was prepared the same night as the arrest, thus alleviating the trial court's concern with Officer Dutchover's testimony, we will consider the report to the extent it is supported by the record; however, we must view the report in the light most favorable to the ruling. *Tucker v. State*, 369 S.W.3d 179, 184–85 (Tex. Crim. App. 2012).

Upon his arrival,[2] Officer Dutchover immediately approached Whittington's vehicle, identified himself, and asked, "Were you in a wreck?" Whittington responded that she was not. Nonetheless, Officer Dutchover informed Whittington that she was involved in a collision and that she did not stop afterward. Whittington continued to deny any involvement in an accident. After repeated attempts to obtain her proof of insurance, Officer Dutchover asked Whittington how many alcoholic beverages she had to drink that night. Whittington replied that she had two drinks around 4:00, but denied having consumed any alcohol within the hour. He advised Whittington that there was a strong odor of alcohol on her breath, and she laughed and said "yeah." Still trying to produce her proof of insurance, she handed him a map instead of her insurance card. After he told her he needed her proof of insurance, not a map, she asked, "What are we looking for?" Officer Dutchover again stated that he needed her proof of insurance. Whittington then laughed and said her boyfriend was going to be mad at her "because . . . you know how boyfriends are, they don't think you should go out . . . work related." Shortly thereafter, Whittington found her insurance card.

After obtaining her proof of insurance, Officer Dutchover told Whittington to "just sit tight" because he needed to talk to Officer Haas for a minute. Whittington inquired, "But who is that guy?" (She was likely referring to Huddleston, who was still parked across from her driveway.) The officers can vaguely be heard talking to each other and, after some chat that cannot be deciphered, Officer Dutchover asked Officer Haas, "Was there a wreck? Are you sure this is the right house?" To help resolve the matter, Officer Dutchover contacted the dispatcher and asked where the other party was. The dispatcher said the caller was in a black SUV, and she communicated that the caller was stating the female who hit him was walking into the house at

---

[2] The patrol-car videotape begins to have audio, in addition to the already viewable visual recording, when Officer Dutchover parks his patrol car in front of Whittington's house. From this point forward, we will recite the events as portrayed on the videotape.

the address of 1312 Park Street and was driving a 1999 black Lexus. Officer Dutchover responded that he was with the female but still needed to know where the other party was. After again asking the dispatcher about the caller's location, it sounds as though Huddleston, who was sitting in his car near the curb, honked his horn. As a result, Officer Haas walked over to Huddleston's car and began a discussion with him, while also inspecting the car for damage.

Meanwhile, Officer Dutchover instructed Whittington to step out and come to the back of her vehicle, advising her that she could lean on the rear of the car for support. Officer Dutchover inquired about some damage to the rear of her vehicle, and she stated it was already there. Officer Dutchover asked for Whittington's keys and requested that she have a seat in her vehicle because she was unsteady on her feet. She denied being unsteady. A few seconds later, Officer Haas communicated something to Officer Dutchover, but we cannot decipher what was said. However, immediately after this communication, Officer Dutchover told Whittington the person she hit was "right there."[3] Whittington inquired about where she hit Huddleston, and Officer Dutchover answered that he was getting the information.

Before moving his car in a position to record Whittington perform field sobriety tests, Officer Dutchover stated: "Do not go inside, stay right there where you're at, . . . do not move, okay?" Whittington replied, "I'm not going to move." This exchange is the key moment in dispute on appeal. Officer Dutchover then moved his car and, while doing so, stated on the video that Whittington "appears to be under the influence of alcohol, is staggering, has a staggered walk, leaning on the vehicle for support, almost stumbled, slurred speech, is fumbling, when I asked for her information, . . . she handed me a map . . . ." After moving his vehicle, Officer Dutchover had Whittington exit her vehicle, and he administered three field sobriety

---

[3] The video shows that Huddleston's car is parked directly in front of Officer Dutchover's patrol car and across the street from Whittington's driveway.

tests—the horizontal gaze nystagmus (HGN) test, the walk and turn test, and the one leg stand test. Whittington was giggling during these tests and did not appear nervous, worried, or otherwise bothered. After showing signs of intoxication during the tests, Whittington was formally arrested and transported to the police station.

Prior to trial, Whittington filed a motion to suppress the videotape and evidence of the arrest. Huddleston and Officer Dutchover testified at the hearing. After hearing the testimony and considering the evidence, including the videotape, the trial court granted Whittington's motion to suppress. Upon the State's request, the trial court made the following findings of fact:

A. The Kerrville Police Department received a call from an unidentified caller regarding an automobile accident.

B. The caller was not identified until after the arrest of the Defendant.

C. The information provided by the unidentified caller was not reliable or credible based [on] the caller not being identified or corroborated until after the arrest of the Defendant.

D. The responding officers, Officer Dutchover and Officer Haas, arrived to the residence of the Defendant.

E. The responding officers, Officer Dutchover and Officer Haas, did not observe the Defendant driving an automobile.

F. The [officers] did not have a warrant for [the defendant's] arrest.

G. The Defendant, after [] questioning by Officer Dutchover during a temporary investigative detention, did not acknowledge [] driving a motor vehicle.

H. The testifying officer, Officer Dutchover, incorrectly testified that the Defendant acknowledged [] driving a motor vehicle during his investigative detention.

I. Officer Dutchover subsequently testified, after reviewing the video at the hearing, that his testimony was incorrect as to the Defendant admitting to driving a motor vehicle during his investigative detention.

J. The State submitted no evidence of any offense being committed in the presence or view of the officers.

K. The State presented no reasonably trustworthy information provided by any person that the Defendant committed an offense.

L. After Officer Dutchover's questioning during his investigative detention, he ordered [the] Defendant to sit, not to move, and not to go in her home.

M. Officer Dutchover testified that he arrested the Defendant for Driving While Intoxicated and for no other offense.

N. The Defendant was under arrest when Officer Dutch[]over took possession of her keys and ordered her to sit, not to move[,] and not to go into her residence based on the totality of the circumstances in that a reasonable person would believe that her freedom of movement was restrained to a degree of formal arrest.

The trial court also made the following conclusions of law:

A. The Officer lacked probable cause to arrest the Defendant on December 15, 2012[,] in violation of the Defendant's rights under the Fourth, Fifth, Sixth[,] and Fourteenth Amendments of the United States Constitution, Article 1, Section[s] 9, 10, and 19 of the Texas Constitution, [and] Article[s] 38.23 and 14.01 of the Texas Code of Criminal Procedure.

B. All evidence obtained by the State after the arrest of the Defendant was obtained illegally and is therefore suppressed.

C. The Court has the sole discretion to judge the credibility and evidence and is the sole judge of the credibility of the evidence and the weight to be given such evidence. See Wyatt v. State, 23 S.W.3d 18, 23 (Tex. Crim. App. 2000). Further, the trial court is free to believe or disbelieve any or all parts of [a] witness's testimony and the Court did not believe Officer Dutchover['s] testimony based on his lack of recollection of the events. See Dewberry v. State, 4 S.W.3d 735, 747 (Tex. Crim. App. 1999). The Court did not give weight or credibility to the testimony of Michael Huddleston for the purposes of probable cause based on his identity not being determined or corroborated until after the arrest of the Defendant. See id.

### STANDARD OF REVIEW

The parties dispute the amount of deference that should be given to the trial court's ruling. Admittedly, the proper standard of review can be difficult to ascertain. We will provide a comprehensive statement of the standard.

When reviewing a trial court's ruling on a motion to suppress, the overarching standard of review guiding appellate courts is whether the trial court abused its discretion. *Tucker v. State*, 369 S.W.3d 179, 184 (Tex. Crim. App. 2012); *Montanez v. State*, 195 S.W.3d 101, 108 (Tex. Crim. App. 2006). *But see, e.g.*, *State v. Mendoza*, 365 S.W.3d 666, 669 (Tex. Crim. App. 2012) (stating that a judge's factual findings should be reviewed for an abuse of discretion while its legal rulings should be reviewed de novo); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997) (en banc) ("[A]n abuse of discretion standard does not necessarily apply to 'application of law to fact questions' whose resolution do not turn on an evaluation of credibility and demeanor."). Under an abuse of discretion standard, we must determine whether the trial court's ruling was so arbitrary that it is outside the zone of reasonable disagreement. *Martinez v. State*, 348 S.W.3d 919, 922–23 (Tex. Crim. App. 2011); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We must consider all evidence in the record, viewing the evidence in the light most favorable to the trial court's ruling. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012); *Tucker*, 369 S.W.3d at 185; *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000). The ruling will be upheld if it is correct under any applicable theory of law. *State v. Iduarte*, 268 S.W.3d 544, 548 (Tex. Crim. App. 2008); *State v. Stevens*, 255 S.W.3d 736, 740 (Tex. Crim. App. 2007).

In determining whether a trial court abused its discretion, an appellate court must utilize a bifurcated method of review. First, we afford almost total deference to the trial court's findings on historical facts supported by the record, "especially when the trial court's fact findings are based on an evaluation of credibility and demeanor."[4] *Guzman*, 955 S.W.2d at 89. Although it

---

[4] Because we defer to the trial court's findings of historical fact, particularly on witness credibility, and because the trial court did not find Officer Dutchover or Huddleston's testimony credible, we have not presented facts from their testimony but, instead, have relied exclusively on the statements made on the patrol-car video. We will defer to the trial court's other findings of fact to the extent they are supported by the record.

is particularly important to give deference to historical fact findings based on credibility and demeanor, we must also defer to all of the trial court's findings of fact and inferences therefrom that are supported by the record, including findings based on video evidence. *Tucker*, 369 S.W.3d at 184–85; *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Montanez*, 195 S.W.3d at 109; *cf. Carmouche*, 10 S.W.3d at 332 (declining to give deference to the trial court's implicit findings not supported by the record and particularly contradicted by videotape evidence, partly because a videotape does not involve credibility assessments to which reviewing courts must be especially deferential). We defer to the trial court's fact findings because the trial court is accustomed to handling these types of matters and is in a better position to make factual determinations. *Mendoza*, 365 S.W.3d at 669. If, however, the trial court's findings and conclusions are not supported by the record, we are not bound by them. *Gonzales*, 369 S.W.3d at 854, 855; *Tucker*, 369 S.W.3d at 187 (Alcala, J., concurring); *see State v. Mazuca*, 375 S.W.3d 294, 308–09 (Tex. Crim. App. 2012) (rejecting the trial court's conclusion on "the flagrancy of the police action" because it was not supported by the record).

Next, we must apply the correct standard of review depending on the nature of the issues raised. We give almost total deference to a trial court's conclusions on mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Iduarte*, 268 S.W.3d at 548; *Guzman*, 955 S.W.2d at 89. However, if we are presented with a mixed question of law and fact that does not hinge on a credibility determination or if it is a purely legal question, we perform a de novo review. *Gonzales*, 369 S.W.3d at 854; *Guzman*, 955 S.W.2d at 89; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996). This is because we have already afforded the trial court's underlying fact findings proper deference so it is no longer in a better position than an appellate court to make the ultimate determination. *Loserth v. State*, 963 S.W.2d 770, 773–74 (Tex. Crim. App. 1998) (en banc); *Guzman*, 955 S.W.2d at 87; *see also Miller v. Fenton*, 474

U.S. 104, 110–12 (1985). It is well settled that probable cause and seizure determinations are reviewed de novo. *Ornelas*, 517 U.S. at 699; *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *Guzman*, 955 S.W.2d at 87.

## MOTION TO SUPPRESS

The State argues the trial court erred in determining Whittington was placed under arrest without probable cause when Officer Dutchover said, "Do not go inside, stay right there where you're at, . . . do not move, okay?" The State, instead, asserts Whittington was still being detained pursuant to an investigative detention and this ongoing detention was supported by reasonable suspicion. Conversely, Whittington contends the trial court correctly ruled she was under arrest because a reasonable person in Whittington's position would have felt a restraint on her freedom of movement to the degree associated with an arrest.[5] Whittington also argues the trial court correctly determined the arrest was made without probable cause because the caller had not yet been identified and the officers lacked sufficient corroboration of the caller's information. Whittington correctly points out that neither party asks us to decide whether there was reasonable suspicion to initially conduct an investigative detention, so we will assume, without deciding, that Whittington's Fourth Amendment rights were not violated during her initial interaction with Officer Dutchover.[6]

### A. *Was This an Investigative Detention or an Arrest?*

There are three types of interactions among police officers and citizens: (1) consensual encounters; (2) investigative detentions; and (3) arrests or their custodial equivalent. *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010); *State v. Perez*, 85 S.W.3d 817, 819 (Tex.

---

[5] This is the standard for a custody determination under *Miranda* and Article 38.22.
[6] This assumption is consistent with the trial court's unchallenged implicit conclusion that the period leading up to the alleged arrest was an investigative detention. This implicit conclusion is evidenced by the trial court's numerous references to actions taken and statements made during the "investigative detention."

Crim. App. 2002). Because the legality of the initial detention is not questioned, we are only asked to determine whether Officer Dutchover's statement, in combination with the totality of the circumstances, was a degree of restraint on Whittington's freedom of movement sufficient to constitute an arrest.

Both a detention and an arrest involve a restraint on one's freedom of movement; the difference is in degree. *Sheppard*, 271 S.W.3d at 290–91; *Castro v. State*, 373 S.W.3d 159, 164 (Tex. App.—San Antonio 2012, no pet.). An arrest is a greater degree of restraint on an individual's freedom of movement than is an investigative detention. *Sheppard*, 271 S.W.3d at 290. The test for whether a person has been arrested is whether the facts demonstrate the individual's liberty of movement was actually restricted or restrained. TEX. CODE CRIM. PROC. ANN. art. 15.22 (2005); *Amores v. State*, 816 S.W.2d 407, 411–12 (Tex. Crim. App. 1991) (en banc).

When determining the type of seizure at issue, we consider the totality of the circumstances. *Martinez*, 348 S.W.3d at 923; *Ford v. State*, 158 S.W.3d 488, 492–93 (Tex. Crim. App. 2005). We use an objective standard when making this determination, disregarding the officer's subjective intent unless it is manifested to the suspect. *Martinez*, 348 S.W.3d at 923; *Ford*, 158 S.W.3d at 492–93. Because this determination is made on an ad-hoc basis, there is no bright-line test for distinguishing between a detention and an arrest. *Sheppard*, 271 S.W.3d at 291. Instead, "common sense and ordinary human experience must govern over rigid criteria." *Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002) (quoting *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997)) (internal quotation marks omitted).

The Court of Criminal Appeals has provided a list of factors properly considered when determining whether the seizure was a detention or an arrest[7]:

> [1] the amount of force displayed, [2] the duration of a detention, [3] the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, [4] the officer's expressed intent—that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and [5] any other relevant factors.

*Sheppard*, 271 S.W.3d at 291 (footnotes omitted) (citing 40 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 7.34 (2d ed. 2001)). Additional factors Texas courts have found relevant when determining the reasonableness of a detention include the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the number of suspects present, the reaction of each suspect, and whether the officer actually conducts an investigation. *See Bartlett v. State*, 249 S.W.3d 658, 669 (Tex. App.—Austin 2008, pet. ref'd); *Akins v. State*, 202 S.W.3d 879, 885 (Tex. App.—Fort Worth 2006, pet. ref'd) (citing *Illinois v. Wardlow,* 528 U.S. 119, 124–25 (2000)).

1.  Use of Force or Show of Authority

During an investigatory detention, officers are permitted to use reasonably necessary force to maintain the status quo, effectuate an investigation, or protect the safety of individuals at the scene. *Balentine*, 71 S.W.3d at 771; *Rhodes*, 945 S.W.2d at 117 (citing *United States v. Sokolow*, 490 U.S. 1, 109 (1989)). For example, it is sometimes reasonable for officers to handcuff suspects during an investigatory detention in order to maintain the status quo or to ensure officer safety. *See Sheppard*, 271 S.W.3d at 286; *Castro*, 373 S.W.3d at 165. Moreover, an investigative detention is not automatically converted into an arrest when officers draw their

---

[7] Whittington points to the four situations described in *Dowthitt v. State* as support for her argument that she was under arrest. Because the situations in *Dowthitt* were presented in a custody analysis and because the Court of Criminal Appeals has declined to decide whether a custody determination always results in an arrest determination, we likewise decline to consider the situations presented in *Dowthitt*. *See Dowthitt*, 931 S.W.2d at 259 n.8.

weapons. *See Marsh v. State,* 684 S.W.2d 676, 679 (Tex. Crim. App. 1984) (en banc); *Martinez*, 304 S.W.3d at 653.

However, a detention can be converted to an arrest when an individual's freedom of movement is almost completely restrained by unreasonable force, an unreasonably strong showing of authority, or an absence of the need to maintain the status quo or officer safety. *See Burkes v. State*, 830 S.W.2d 922, 925 (Tex. Crim. App. 1991) (en banc) (without any prior questioning, officer shined a flashlight in the appellant's eyes, ordered him to lie on the ground, and handcuffed him); *Amores*, 816 S.W.2d at 411 (officer blocked in appellant's car, ordered him out of the car at gunpoint, ordered him to lie face down on the pavement with his hands behind his back, and threatened to shoot if he did not obey); *Hoag v. State*, 728 S.W.2d 375, 379 (Tex. Crim. App. 1987) (en banc) (suspect removed from the car at gunpoint, taken to the rear of the car, and given *Miranda* warnings); *Campbell v. State*, 325 S.W.3d 223, 236 (Tex. App.—Fort Worth 2010, no pet.) (keys taken and suspect handcuffed despite a lack of safety concerns since there were three officers with one suspect); *Akins*, 202 S.W.3d at 888 (officers blocked appellant's vehicle, drew weapons, placed him on the ground, handcuffed him, and asked no questions prior to these events); *State v. Moore*, 25 S.W.3d 383, 386 (Tex. App.—Austin 2000, no pet.) (suspect handcuffed without need to maintain the status quo or officer safety); *Gordon v. State*, 4 S.W.3d 32, 37 (Tex. App.—El Paso 1999, no pet.) (suspect handcuffed and placed in the patrol car in the absence of evidence that such measures were necessary); *Rodriguez v. State*, 975 S.W.2d 667, 675–77 (Tex. App.—Texarkana 1998, pet. ref'd) (prior to any investigation, officers blocked suspect's car, removed him from the car at gunpoint, and forced him to lie face down); *Flores v. State*, 895 S.W.2d 435, 441 (Tex. App—San Antonio 1995, no writ) (suspect removed from the car at gunpoint and ordered to assume a spread-eagle position).

In this case, Officer Dutchover did not use the type of force or show of authority usually associated with an arrest. Officer Dutchover did not use physical force, or display or threaten to use a weapon when he directed Whittington not to move and not to enter her residence. Officer Dutchover did not yell or use a hostile tone of voice when he gave this instruction to Whittington. Immediately before making the statement in controversy, Whittington asked Officer Dutchover where she hit Huddleston and he responded that he was trying to obtain that information. He then told her not to enter her residence, not to move, and to sit where she was. Immediately after this, Officer Dutchover moved his patrol car. Although Whittington was asked to sit in her vehicle while Officer Dutchover moved his car, the door of her vehicle remained open. This is a lesser degree of restraint than handcuffing a suspect or ordering a suspect to lie face down on the ground. Officer Dutchover's instruction to sit, not to move, and not to enter her residence does mean she was not free to leave; however, not being free to leave is an inherent feature of a temporary *detention*. *Crain*, 315 S.W.3d at 49; *Sheppard*, 271 S.W.3d at 289 ("That is precisely what *Terry* permits—a temporary detention, in which the person is not free to leave, while the police officer investigates whether a crime has been committed.").

2. Duration of Detention

We may consider the duration of the detention in determining whether Whittington was under arrest. Officer Dutchover made the disputed statement less than ten minutes after first making contact with Whittington, and he conducted field sobriety tests, handcuffed her, and informed her she was being arrested less than twenty minutes after first arriving at the residence. Additionally, Whittington was sitting in her vehicle for only one minute and twelve seconds while Officer Dutchover was moving his patrol car. Neither the amount of time before Whittington was directed to sit in her vehicle, the amount of time Whittington was actually in her vehicle, nor the total length of the interaction prior to the formal arrest was sufficiently long to

elevate this interaction from a detention to an arrest. *See Belcher v. State*, 244 S.W.3d 531, 542 (Tex. App.—Fort Worth 2007, no pet.) (concluding that a twelve-minute initial investigation followed by a twenty-seven minute period of waiting for an officer trained in DWI investigation was not unreasonable because the wait served legitimate law-enforcement purposes); *see also United States v. Sharpe*, 470 U.S. 675, 687–88 (1985) (rejecting the notion that a twenty-minute detention is unreasonable when the investigation was done in "a diligent and reasonable manner"); *Castro*, 373 S.W.3d at 165–66 (holding that a twenty-five to forty-five minute detention was not unreasonable when police were performing tasks pursuant to investigatory procedure).

3. Transportation, Investigation, and Officer's Intentions

We also note that Whittington was never transported prior to the formal arrest at the conclusion of the field sobriety tests. Officer Dutchover never told Whittington she was under arrest or said anything to that effect. *Cf. Castro*, 373 S.W.3d at 166 (concluding that Castro was subjected to an investigative detention despite being handcuffed and told he was under arrest). In the seconds preceding the instruction to sit in her car, Whittington was asking Officer Dutchover questions about the accident, and he replied that he was in the process of gathering all of the information. If anything, this exchange shows that he was in the midst of an investigation. Also, Whittington was giggling periodically during the interaction leading up to the statement and was seemingly undisturbed by Officer Dutchover's instruction for her not to move.

4. Additional Factor—Taking Whittington's Keys

This case presents an additional and less common circumstance for consideration: the fact that Officer Dutchover took Whittington's keys prior to making the statement at issue. Although this is an additional restraint on Whittington's freedom of movement, it is not enough to escalate this detention into an arrest. In *Campbell v. State*, the Fort Worth Court of Appeals addressed

whether an individual will be deemed arrested after an officer takes his keys. *Campbell*, 325 S.W.3d at 235. Much like this case, the officer did not explain why he was taking the keys, and the officer retained the keys during the remainder of the interaction. *Id.* Nonetheless, the court determined the officer's actions surrounding his taking of the keys, mainly asking questions to confirm or dispel his suspicions, were consistent with actions taken during an investigative detention; thus, the court declined to find that taking Campbell's keys escalated the stop beyond a detention. *Id.* Additionally, in *Horton v. State*, 16 S.W.3d 848, 852 (Tex. App.—Austin 2000, no pet.), the Austin Court of Appeals concluded Horton was subjected only to an investigative detention when the officers "ordered him out of the car, took his keys, and prevented him from reentering the car." *Id.* This is because the officers had been at the scene only momentarily, Horton was not physically restrained, and there was an ongoing investigation. *Id.* In *White v. State*, No. 08-06-00050-CR, 2007 WL 853134, at *4 (Tex. App.—El Paso March 22, 2007, no pet.) (not designated for publication), the El Paso Court of Appeals also held that taking the appellant's keys did not prevent the stop from being a detention because the officer had not dispelled his suspicion that the appellant was intoxicated, and allowing the appellant to retain his keys could have created a dangerous situation. *Id.*

Much like the cases cited above discussing an officer's seizure of the suspect's keys, Officer Dutchover was justified in taking and retaining Whittington's keys in order to maintain the status quo while he moved his car and to protect the safety of himself, Whittington, Officer Haas, and Huddleston. Whittington was unaware that she had been in an accident less than an hour earlier, and she was displaying signs of intoxication. It was not unreasonable for Officer Dutchover to take her keys and thereby prevent her from trying to leave or otherwise move her vehicle while he was moving his patrol car. Further, after moving his vehicle, Officer Dutchover

returned to Whittington and continued his investigation by conducting three different field sobriety tests.

After a de novo application of the law, the question becomes whether the trial court's ruling that Whittington was under arrest was outside the zone of reasonable disagreement. *Martinez*, 348 S.W.3d at 922–23; *Dixon*, 206 S.W.3d at 590. Even if we defer to the trial court's credibility determinations and, as a result, disregard all testimony, which we do not contend is necessary, the video evidence still indisputably shows the trial court's findings to be erroneous. Considering the totality of the circumstances, the degree of restraint does not "appear[] [to be] more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation." *Sheppard*, 271 S.W.3d at 291. Thus, we conclude the trial court abused its discretion when it ruled that Whittington was arrested when told to sit, not to move, and not to enter her home.

### B. *Was the Informant Identified and Was the Information Corroborated?*

We are next asked to determine whether the trial court erred in finding that the informant was not identified and the information was not adequately corroborated prior to Officer Dutchover's statement to Whittington to sit in her car. Both of these findings by the trial court are shown to be incorrect by the patrol-car video. The video clearly shows that Huddleston had been identified by both officers before Officer Dutchover made the statement at issue. This is reflected when Officer Haas, who had identified and was interviewing Huddleston, yelled to Officer Dutchover, and Officer Dutchover immediately thereafter advised Whittington that the person she hit was "right there."

The video also reflects that the information provided by Huddleston had been corroborated prior to Officer Dutchover's statement. Whittington was found in a black SUV like the one Huddleston reported at the address Huddleston reported. Further, between the

information provided by Huddleston, Huddleston following Whittington to her residence after the collision, the fact that Whittington was found sitting in the driver's seat of her vehicle, Whittington's statements that her boyfriend would be mad she had been out, and the fact that she never indicated she was not driving, it can be inferred that she had only recently arrived home. Additionally, both cars were inspected by the officers and minor damage was found on Whittington's back bumper, which is consistent with Huddleston's report. The trial court's findings of fact that Huddleston was unidentified and that there was inadequate corroboration are not supported by the record and, indeed, are indisputably proven to be incorrect by the video evidence. Therefore, we need not defer to the trial court's findings of fact on these issues. *Gonzales*, 369 S.W.3d at 854, 855; *Tucker*, 369 S.W.3d at 187 (Alcala, J., concurring); *Carmouche*, 10 S.W.3d at 331–32.

Because we do not agree that Whittington was under arrest at the time Officer Dutchover made the statement at issue, we need not address whether the information available at that time was sufficient for probable cause. The State, on the other hand, argues Huddleston's information was reliable and adequately corroborated and, under the totality of the circumstances, it provided reasonable suspicion for the continued detention of Whittington in order to perform field sobriety tests. We agree.

The quality of information provided by an informant generally relates to the legality of the initial stop. *See, e.g.*, *Martinez*, 348 S.W.3d at 923; *Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005). However, that is not challenged here. Still, the reliability of Huddleston's tip contributes to the reasonable suspicion necessary for the continued detention of Whittington for driving while intoxicated. *See Martinez*, 348 S.W.3d at 923 ("To justify further investigation, the state must show that, at the time of the detention, the officer had specific, articulable facts that established reasonable suspicion" that the individual has been, is, or will be

engaged in criminal activity). Huddleston's information was reliable and provided Officer Dutchover with a reasonable belief that Whittington had been driving and had earlier been involved in an accident that she was unaware of. This knowledge, in combination with Officer Dutchover's observation of possible intoxication, justified continued investigation.

A tip from an anonymous caller, standing alone, rarely supplies reasonable suspicion for a stop because it lacks "sufficient indicia of reliability." *Martinez*, 348 S.W.3d at 923. However, information provided by a citizen can prove to be sufficiently reliable under certain circumstances. *Brother*, 166 S.W.3d at 260. "An inverse relationship exists between the reliability of the informant and the amount of corroborated information required to justify the police intrusion; the less reliable the tip, the more information is needed." *Martinez*, 348 S.W.3d at 923. It is well established that "information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable." *Derichsweiler v. State*, 348 S.W.3d 906, 918 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 150 (2011); *see also Martinez*, 348 S.W.3d at 923; *Brother*, 166 S.W.3d at 257.

Huddleston placed himself in a position to be accountable for the information he provided by remaining at Whittington's residence, identifying himself to police, speaking with police at the residence, and testifying at the suppression hearing. Prior to Officer Dutchover's statement and the continued detention, Huddleston had been identified and was being interviewed by Officer Haas. Although Officer Dutchover may not have known all of the details,[8] reasonable suspicion is based on the collective knowledge of the government actors,

---

[8] The trial court appeared to rely heavily on the mistaken belief that an officer must personally observe an offense or suspicious behavior. *See Brother v. State*, 166 S.W.3d 255, 257, 260 (Tex. Crim. App. 2005) (citing *Adams v. Williams*, 407 U.S. 143, 147 (1972)).

including the dispatcher. *Derichsweiler*, 348 S.W.3d at 918. Thus, Officer Dutchover was entitled to rely on the information that Whittington had been driving and was involved in an accident, and he had reason to suspect Whittington may have been intoxicated based on the odor of alcohol on Whittington's breath when he approached and Whittington's stumbling, fumbling, and unsteadiness on her feet during their initial interaction. Under these circumstances, Officer Dutchover was reasonable in suspecting that a crime, driving while intoxicated, had been committed, and his continued detention was reasonably necessary to confirm or dispel his suspicion.

## CONCLUSION

Based on the totality of the circumstances, we hold that Whittington was not under arrest when told to sit, not to move, and not to go into her home. Because she was not under arrest, we need not determine whether probable cause existed at that time. We do, however, conclude that Officer Dutchover had reasonable suspicion to continue his investigation. For these reasons, we reverse the trial court's grant of Whittington's motion to suppress and remand to the trial court for further proceedings consistent with this opinion.

Catherine Stone, Chief Justice

PUBLISH