# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00749-CR

**The State of Texas, Appellant**

**v.**

**Randall Lee Worrell, Appellee**

---

**FROM THE DISTRICT COURT OF BURNET COUNTY, 424TH JUDICIAL DISTRICT
NO. 45389, HONORABLE EVAN C. STUBBS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

The State of Texas appeals the district court's amended order granting Randall Lee Worell's motion to suppress evidence of methamphetamine gathered after a traffic stop and a search. *See* Tex. Code Crim. Proc. art. 44.01(a)(5). In a single issue consisting of two subparts, the State contends that (1) the court abused its discretion by determining, without support in the record, that the investigating officer "deliberately perpetrated an illegal stop" with "actual knowledge" that Worrell had not committed an offense and "with egregious disregard of the right to privacy and/or personal integrity that the Fourth Amendment protects" and (2) even if the stop was unlawful, the officer's discovery of Worrell's outstanding arrest warrant was an intervening circumstance between the stop and the discovery of the narcotics that attenuated the "taint" of such stop. We will reverse the district court's amended order suppressing the evidence and remand this cause for further proceedings consistent with this opinion.

## BACKGROUND

Deputy Jeremy Stewart of the Burnet County Sheriff's Office, a certified peace officer with almost ten years' experience, was the only witness at the hearing on the motion to suppress. He testified that he was on overnight duty parked at a bank parking lot when he saw Worrell driving his dually truck and dump trailer into the parking lot of a property across the street, formerly a gas station. Deputy Stewart stated that the gas station was no longer in business, was the source of numerous complaints of trespassing and illegal dumping, and was placed on the sheriff's office list for "close patrol." He recalled seeing several items dumped there previously, including a mattress, bed frame, and miscellaneous household trash. Deputy Stewart testified that he saw Worrell park in the area "where all the dumping was taking place" and in such a way that the driver's side of the truck and the end of the trailer were not visible. Given the darkness, the light traffic, the no-trespassing signs that he recalled were posted on the property, and the partially-obscured area on the side of the business where Worrell parked, Deputy Stewart testified that he thought there was no reason for anyone but the business owner to be there, that he thought that trespassing had taken place, and that there was a strong possibility of illegal dumping. But Deputy Stewart also testified that the position of Worrell's vehicle prevented him from seeing anything on the driver's side and the trailer's end, including the suspected illegal dumping.

Deputy Stewart stated that after Worrell drove away, he followed and initiated a stop. Deputy Stewart testified that when he asked Worrell for identification, he noticed his nervous demeanor. Deputy Stewart stated that he conducted his routine investigation steps of running Worrell through dispatch to identify him and requesting a local warrant check. Video from the dashboard camera in Deputy Stewart's patrol car was admitted into evidence, showing Deputy

2

Stewart speaking with Worrell and his passenger after the stop. In conversation shortly after the stop, Worrell volunteers to Deputy Stewart that he "got out," and they discuss certain aspects of his parole. Minutes into the stop, the dispatcher is heard on the video advising Deputy Stewart that Worrell had an active warrant. Next, Deputy Stewart is heard telling Worrell that he was being detained pending confirmation of the warrant. Conversations between Deputy Stewart and the dispatcher captured on the video show that Deputy Stewart waited at the scene for Worrell's boss to take the trailer that Worrell had been using and for a wrecker to impound Worrell's truck because it had no insurance and Worrell's passenger had no valid driver's license. After the dispatcher reported that she had a teletype confirming Worrell's warrant, Deputy Stewart arrested Worrell and drove him to jail. Although the record of the suppression hearing stops before discussion of precisely how and when the narcotics were found, Worrell's motion to suppress states that he was arrested for possession of a controlled substance as a result of his detention and the search that followed his arrest.

A grand jury indicted Worrell for possession of a controlled substance (methamphetamine), and he filed a motion to suppress evidence of that offense, contending that his detention and the search that followed were unlawful. The district court granted Worrell's motion, which the State appealed. The court made these findings and conclusions:

## I. FINDINGS OF FACT

1. The Court had the opportunity to evaluate the demeanor and credibility of Jeremy Stewart, the State's sole witness.

2. Officer Jeremy Stewart observed the Defendant's vehicle enter and park on the edge of an open parking lot that is fronted by a state highway adjacent to a

3

closed business for approximately five minutes at approximately 8:25p.m., on the night of October 6, 2015.

3. Nothing about the location of the Defendant, the time of night, the type of vehicle driven by the Defendant, or the fact that the Defendant was pulling a construction trailer would raise a level of suspicion to an objectively reasonable officer.

4. No chains or barriers, of any kind, restricted entry to the parking lot or placed the public on notice that entry was forbidden.

5. No credible evidence was presented that the public, or this defendant, was placed on notice that entry to the parking lot was forbidden.

6. No credible evidence was presented that there were any "No Trespassing" signs posted in any visible location that provide notice to the public, or this defendant, that entry to the parking lot was forbidden.

7. Despite maintaining constant view of the vehicle from the time it entered the parking lot until the time it exited the parking lot, Officer Jeremy Stewart never saw the Defendant, or anyone else, exit the vehicle, or do anything illegal, or even objectively suspicious.

8. Officer Jeremy Stewart agreed that his offense report states that, "At this time I thought that maybe the truck dumped something out of the trailer or possibly committed some type of theft from around the building," despite the fact that both options are objectively impossible without someone exiting the vehicle, and Officer Stewart knew that no person had exited the vehicle.

9. Officer Jeremy Stewart maintained that he thought the defendant "possibly dumped something or committed some type of theft."

10. Officer Jeremy Stewart observed no specific facts that would suggest that the Defendant, or anyone associated with the Defendant, illegally dumped anything or committed any kind of theft.

11. It would be objectively impossible for this defendant to have "dumped something" or "possibly committed some type of theft" without someone exiting the Defendant's vehicle while it was stopped.

12. Officer Jeremy Stewart observed only activity or conduct that could be characterized as perfectly innocent conduct.

4

13.  Officer Jeremy Stewart observed the Defendant resume travel onto the public roadway.

14.  Officer Jeremy Stewart initiated a traffic stop of the Defendant.

15.  Officer Jeremy Stewart initiated the traffic stop despite actual knowledge that the Defendant had not "dumped something or committed some type of theft."

## II. CONCLUSIONS OF LAW

1.  The officer's articulated basis for the stop of the defendant constitutes, at most, a mere hunch within the gambit of *Terry vs. Ohio*.

2.  The Defendant was not trespassing on the night of October 6, 2015.

3.  Officer Jeremy Stewart lacked reasonable suspicion for the stop of the Defendant.

4.  The stop was an objectively unreasonable violation of Defendant's Fourth Amendment right to be free from unreasonable searches and seizure.

5.  The discovery of the warrant would not have occurred but for the police misconduct that occurred with actual, first hand, knowledge that the alleged reason for the stop had not occurred and was objectively impossible.

6.  The reason for the stop was not based upon a mistaken understanding of the law and a subjective belief that a violation had occurred as in *State v. Mazuca*, but instead, this stop was the result of actions by an officer with actual, first hand, knowledge that the alleged reason for the stop had not occurred and could not possibly have occurred as he had observed the Defendant the entire time that the Defendant was stopped and knew that the Defendant had never exited his vehicle and that "dumping" and/or "theft" were objectively impossible without exiting the vehicle.

7.  The intervening discovery of the warrant did not attenuate the illegality of the stop.  This officer deliberately perpetrated what he knew, or should have known, to be an illegal stop (based on reason that he knew was false) with no reasonable explanation other than a hope or expectation that the stop might generate some legitimate after-the-fact justification to arrest and/or search with egregious disregard of the right to privacy and/or personal integrity that the Fourth Amendment protects.

5

8. To admit the physical evidence based on the fortuity that an arrest warrant happened to come to light after the illegal stop, but before the evidence was discovered, would perversely serve to encourage official misconduct by this officer, as well as other law enforcement officers, in the future.

## DISCUSSION

The State contends that the court abused its discretion by determining, without support in the record, that Deputy Stewart "deliberately perpetrated an illegal stop" with "actual knowledge" that Worrell had not committed an offense. The State further contends that even if the stop was unlawful—which it does not concede—Deputy Stewart's discovery of Worrell's outstanding arrest warrant was an intervening circumstance between the stop and the discovery of the narcotics that attenuated the "taint" of such stop.

**Standard of review**

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion and overturn the ruling only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). When a trial court makes explicit fact findings, we determine whether the evidence viewed in the light most favorable to the trial court's ruling supports the fact findings. *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We give almost complete deference to the trial court's determination of historical facts, but we review the court's application of the law to those facts de novo. *Story*, 445 S.W.3d at 732; *Dixon*, 206 S.W.3d at 590. We are not bound by the trial court's findings and conclusions that are not supported by the record. *State v. Whittington*, 401 S.W.3d 263, 271 (Tex. App.—San Antonio 2013,

6

no pet.); *see State v. Mazuca*, 375 S.W.3d 294, 308-09 (Tex. Crim. App. 2012) (rejecting trial court's conclusion as to "flagrancy of the police action" that was not supported by record).

**Attenuation doctrine**

To enforce the Fourth Amendment's prohibition against unreasonable searches and seizures, courts sometimes exclude evidence obtained by unconstitutional police conduct. *Utah v. Strieff*, 136 S. Ct. 2056, 2059 (2016); *see* Tex. Code Crim. Proc. art. 38.23(a) (setting forth exclusionary rule: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case."). But neither the Fourth Amendment nor the Texas exclusionary rule in article 38.23(a) of the Code of Criminal Procedure requires suppression of evidence that was not obtained as a result of some illegality. *State v. Jackson*, 464 S.W.3d 724, 741 (Tex. Crim. App. 2015). Evidence is not obtained in violation of the law within the plain meaning of article 38.23 if the "taint" from the illegality has dissipated by the time the evidence is acquired. *Wehrenberg v. State*, 416 S.W.3d 458, 469 (Tex. Crim. App. 2013) (citing *Johnson v. State*, 871 S.W.2d 744, 750 (Tex. Crim. App. 1994)).

The federal attenuation doctrine provides that evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Strieff*, 136 S. Ct. at 2061. In such cases, the link between the unconstitutional conduct and the discovery of the evidence is considered too "attenuated" to justify suppression. *Id*. at 2059. The

Court of Criminal Appeals has "adopted the federal attenuation doctrine as being consistent with the express provisions of Article 38.23 because 'evidence sufficiently attenuated from the violation of the law is not considered to be 'obtained' therefrom.'" *Wehrenberg*, 416 S.W.3d at 469 (quoting *Johnson*, 871 S.W.2d at 750-51).

To determine whether the attenuation doctrine applies here and whether evidence of the narcotics is admissible, we consider three factors: (1) the temporal proximity of the stop to the seizure of the evidence, (2) the presence of intervening circumstances, and particularly, (3) the purpose and flagrancy of the official misconduct. *See Jackson*, 464 S.W.3d at 731; *Mazuca*, 375 S.W.3d at 302. Discovery of an arrest warrant—occurring after an unlawful stop but before discovery and seizure of evidence—may be an intervening circumstance that "attenuate[s] the taint" of the unlawful stop when there is no purposeful or flagrant misconduct by police. *Mazuca*, 375 S.W.3d at 310; *see Strieff*, 136 S. Ct. at 2064. In such circumstances, discovery of the arrest warrant changes the importance of the attenuation factors in that "'the importance of the temporal proximity factor decreases,'" and the third factor, "'the purposefulness and/or flagrancy of the police misconduct, *vel non*, becomes of vital importance.'" *Jackson*, 464 S.W.3d at 731-32 (quoting *Mazuca*, 375 S.W.3d at 306-07).

Worrell did not address the attenuation doctrine or its three-factor test at the hearing on the motion to suppress; rather, he contended that the discovery of the arrest warrant and anything beyond the stop was irrelevant:

> And irregardless [sic] of whether or not a traffic warrant was discovered later is not relevant to the issue presented here today because the only real issue is was there reasonable suspicion . . . that there was, in fact, criminal activity going on, about to happen, or had just happened. So the only thing that I will take issue with is . . . the

8

fact that a warrant was discovered later would somehow affect this because it doesn't.

. . . .

This motion to suppress is about the stop, and that's all. We're going beyond the stop, so this is not relevant to what we have before the court.

. . . .

This is not relevant to the issue of the traffic stop. What happened down at the sheriff's department is just not relevant to the traffic stop.

Apparently persuaded by these arguments, the district court did not make findings and conclusions on the three factors of the attenuation doctrine, the court agreed not to view the dash-cam video beyond the point where Deputy Stewart believed the warrant was confirmed and Worrell was taken into custody, and the court sustained Worrell's objection to Deputy Stewart's testimony about routine actions he took regarding his patrol vehicle after he had taken Worrell to jail. However, Worrell's arguments conflict with controlling precedent showing that an arrest warrant discovered after an unlawful traffic stop but before a search yielding narcotics can be relevant. *See Mazuca*, 375 S.W.3d at 310 (holding that although defendant's initial stop was illegal, evidence of ecstasy found in his pants was admissible because arresting officers' behavior was not particularly purposeful or flagrant and discovery of defendant's outstanding arrest warrants broke causal connection between stop and discovery of ecstasy); *see also Strieff*, 136 S. Ct. at 2062, 2064 (holding that evidence of methamphetamine and drug paraphernalia that officer seized in search incident to arrest was admissible, even if he lacked reasonable suspicion to stop defendant, because officer's discovery of arrest warrant attenuated connection between unlawful stop and evidence seized incident to arrest). We proceed to consider the three attenuation-doctrine factors.

**Attenuation-doctrine factors weigh against suppression of the evidence**

### 1. Temporal proximity

As to the first factor, temporal proximity between the stop and obtaining the evidence, the record indicates that Worrell's traffic stop did not occur close to the time that the evidence of narcotics was discovered. The dash-cam video shows that the narcotics had not been discovered between the time that Deputy Stuart stopped Worrell and almost two hours later when they arrived at the garage entry to the jail, but the narcotics were discovered sometime after that. Because the narcotics were not found shortly after the stop, this factor weighs against suppression. *Mazuca*, 375 S.W.3d at 306, 308 (noting that temporal-proximity factor "usually favors suppression of evidence that is discovered in the immediate aftermath of an illegal pedestrian or roadside stop").[1]

### 2. Intervening circumstances

The second factor, the presence of intervening circumstances, also weighs against suppression. Deputy Stewart's discovery of Worrell's outstanding arrest warrant, within minutes of the stop, qualified as an intervening circumstance between the stop and the search that ultimately yielded the narcotics. *See Mazuca*, 375 S.W.3d at 310; *see also Strieff*, 136 S. Ct. at 2064. That search was conducted only after Worrell had been arrested for the outstanding warrant and was a result of that arrest, not a result of the traffic stop. Further, the arrest warrant predated Deputy Stewart's investigation and was entirely unconnected to the stop. *See Strieff*, 136 S. Ct. at 2062.

---

[1] Even if the narcotics had been discovered "in the immediate aftermath" of the stop, the temporal-proximity factor does not weigh heavily when there is an intervening discovery of an arrest warrant. *State v. Mazuca*, 375 S.W.3d 294, 306-07 (Tex. Crim. App. 2012) ("[W]hen an outstanding arrest warrant is discovered between the illegal stop and the seizure of physical evidence, the importance of the temporal proximity factor decreases.").

### 3. Purpose and flagrancy of official misconduct

The third and most important factor, the "purpose and flagrancy of the official misconduct," also weighs against suppression. Here, the district court determined that Deputy Stewart "deliberately perpetrated an illegal stop" with "actual knowledge" that Worrell had not committed an offense and "with egregious disregard of the right to privacy and/or personal integrity that the Fourth Amendment protects." No evidence in the record supports these determinations.

The court could not have reasonably found that Deputy Stewart "knew that no person had exited the vehicle" and that he "initiated the traffic stop despite actual knowledge that the Defendant had not 'dumped something or committed some type of theft.'" The evidence in this record is that Deputy Stewart could not see the illegal acts that he suspected because Worrell had parked in such a way that the driver's side of the truck and the end of the trailer were not visible. Deputy Stewart consistently testified that because of his obstructed view of the driver's side of the truck and the back side of the trailer, he could not see whether anyone had exited the vehicle or whether any illegal actions had occurred:

> Q. Did you ever see him [Worrell] get out of his vehicle?
>
> A. No, I could not.
>
> . . . .
>
> Q. And in order to have committed a theft an individual would have had to have gotten out of the truck and gone and done something, right?
>
> A. Correct, but I did not have a visual view of the driver's side of the truck.
>
> . . . .
>
> Q. But this vehicle never–you never saw him [Worrell] go behind the building, did you?

11

A.  No, but again, I never saw the driver's side of the vehicle, so I cannot confirm or deny that nobody exited the driver's side of the vehicle and may have dumped something behind the building.

The court did not make a finding that Deputy Stewart's testimony about being unable to see the driver's side of the truck or the end of the trailer was not credible.  The court did not state that it disbelieved Deputy Stewart's testimony that he was unable to confirm or deny whether anyone exited the driver's side of the vehicle and may have dumped something behind the building.  Instead, the court's finding went beyond the facts in this record and reasonable inferences from those facts to find that Deputy Stewart initiated the stop "despite actual knowledge that the Defendant had not 'dumped something or committed some type of theft.'"  Nothing in the record indicates that Deputy Stewart had any personal animosity toward Worrell or that Deputy Stewart had any history of misconduct that would support the court's finding that Deputy Stewart knowingly initiated an unjustified and illegal traffic stop.  *See Strieff*, 136 S. Ct. at 2063 (noting that there was no evidence that officer's stop was part of some systemic or recurrent police misconduct).  Further, nothing in the record indicates that Deputy Stewart's conduct was "egregiously abusive," that he exhibited any awareness of impropriety of his stop, or that the manner in which he conducted the stop was calculated to cause surprise, fright, or confusion.  *See Mazuca*, 375 S.W.3d at 309 & n.71 (deciding that element of purposefulness was not met because record did not support conclusion that officer's conduct during course of unlawful traffic stop was in flagrant derogation of defendant's Fourth Amendment rights).

From its unsupported fact findings the court then drew incorrect legal conclusions, including that Deputy Stewart had "actual, first hand, knowledge that the alleged reason for the stop had not occurred," that Deputy Stewart "deliberately perpetrated what he knew, or should have known, to be an illegal stop," and that Deputy Stewart acted "with egregious disregard of the right

12

to privacy and/or personal integrity that the Fourth Amendment protects." Contrary to the court's conclusions, this record shows no "deliberately perpetrated" illegal stop, no initiation of a traffic stop with "actual knowledge" that Worrell had not "dumped something or committed some type of theft," and no "egregious disregard" for Fourth Amendment rights. Rather, the record reflects that the stop occurred in connection with Deputy Stewart's investigation of suspected trespassing, theft, and illegal dumping in the parking lot of a vacant property. That property had been the source of numerous complaints of trespassing and illegal dumping, that property was where Deputy Stewart had previously seen a mattress, bed frame, and miscellaneous household trash dumped, and that property had been placed on the sheriff's office list for "close patrol." *See Mazuca*, 375 S.W.3d at 308-09 (noting that element of purposefulness was lacking because officers who stopped defendant had been tasked with looking for traffic violators, not to find motorists with outstanding warrants to conduct searches incident to arrest); *see also Strieff*, 136 S. Ct. at 2064 (noting that officer's errors in judgment while investigating suspected drug house did not rise to level of "purposeful or flagrant violation of [defendant's] Fourth Amendment rights"); *Leming v. State*, 493 S.W.3d 552, 565 (Tex. Crim. App. 2016) (noting that determination that reasonable suspicion exists need not rule out possibility of innocent conduct; indeed, principal function of detaining officer's investigation is to resolve that very ambiguity and establish whether activity is in fact legal or illegal).

Deputy Stewart's good-faith belief in the lawfulness of the traffic stop was even acknowledged by Worrell's counsel at the hearing on the motion to suppress: "You know, Judge, I don't—I don't doubt that Officer Stewart believed that he had reasonable suspicion, but the problem is that his reasonable suspicion was a subjective opinion that he made." Recognition that Deputy Stewart "believed that he had reasonable suspicion" for the stop is plainly inconsistent with

13

the findings and conclusions that Deputy Stewart made the stop with actual knowledge that it was unjustified and illegal. We are not bound by unsupported findings and conclusions. *See Whittington*, 401 S.W.3d at 271; *see also Mazuca*, 375 S.W.3d at 308-09. Here, as in *Mazuca*, the court's findings and conclusions "effectively *presume*" purposeful and flagrant misconduct from what it considered an unlawful stop alone, rather than assessing the character of that stop—"and of any subsequent police conduct"—to determine whether it indicates that the officer "*actually* behaved purposefully or flagrantly" in this case. *See Mazuca*, 375 S.W.3d at 310 (emphases in original).

Applying the three attenuation-doctrine factors to the evidence in this record—even considered in the light most favorable to the district court's ruling—weighs against suppression. The evidence of narcotics is admissible because that evidence was sufficiently attenuated from the complained-of traffic stop as to be considered separate from it, i.e., not "obtained" from the stop. *See Wehrenberg*, 416 S.W.3d at 469; *Johnson*, 871 S.W.2d at 750-51. The search that yielded the narcotics was conducted only as a result of Worrell's arrest for the outstanding warrant, not as a result of the stop. Assuming that the stop of Worrell was unlawful, nothing in this record shows the level of purposefulness or flagrancy of Deputy Stewart's conduct that the court's findings and conclusions attribute to him. *See Mazuca*, 375 S.W.3d at 310; *see also Strieff*, 136 S. Ct. at 2064. In the absence of such purposeful or flagrant conduct, Deputy Stewart's discovery of Worrell's outstanding arrest warrant was an intervening circumstance that was "wholly independent" of the stop, broke the causal connection between the stop and the discovery of the narcotics, and purged the "taint" of the stop, if any. *See Mazuca*, 375 S.W.3d at 310; *see also Strieff*, 136 S. Ct. at 2063. The order granting suppression of the evidence, on this record, was outside the zone of reasonable disagreement and constituted an abuse of discretion. *Cf. Story*, 445 S.W.3d at 732; *Dixon*,

14

206 S.W.3d at 590; *see State v. Chupik*, No. 03-09-00356-CR, 2011 Tex. App. LEXIS 7597, at *8 (Tex. App.—Austin Sept. 15, 2011, no pet.) (mem. op., not designated for publication) (concluding that court's order granting motion to suppress that was not supported by evidence was abuse of discretion). We sustain the State's appellate issue.

## CONCLUSION

We reverse the district court's amended order granting suppression of the evidence and remand this cause for further proceedings consistent with this opinion.


_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Field and Bourland

Reversed and Remanded

Filed:   July 26, 2017

Do Not Publish